IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 12, 2011 Session

# ICG LINK, INC. v. PHILIP STEEN ET AL. v. TN SPORTS, LLC v. ICG LINK, INC.

**Appeal from the Chancery Court for Davidson County**
**No. 09727-IV      Russell T. Perkins, Chancellor**

_____

**No. M2010-02470-COA-R3-CV - Filed October 31, 2011**

_____

This is a dispute concerning payment for website development services. The plaintiff, a website development company, filed suit against the defendants, an LLC and its managing member in his individual capacity, alleging breach of contract and unjust enrichment. The trial court found there was no express contract between the parties due to a lack of mutual assent. The court found there was a quasi-contract and that plaintiff was entitled to the reasonable value of its services, minus the costs incurred by defendants in attempting to repair the defects in the website. Last, the court held the individual defendant personally liable for the judgment. We affirm the finding of a quasi-contract and the personal liability of the individual defendant; however, we modify the trial court's monetary award, finding the plaintiff is entitled to recover a judgment of $13,952.88. The court's holding is affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Modified in Part and Remanded**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Jay R. Slobey, Nashville, Tennessee, for the appellants, Philip Steen, Nashville Sports Leagues, Nashville Sports Leagues LLC and TN Sports LLC.

Randall K. Winton, Nashville, Tennessee, for the appellee, ICG Link, Inc.

## OPINION

The plaintiff, ICG Link, Inc. ("ICG"), is a website development and hosting company with its principal offices in Franklin, Tennessee. The three defendants are Nashville Sports

Leagues, LLC; TN Sports, LLC; and their founder and sole member, Philip Steen (collectively "Defendants"). The issues concern payment for services rendered by ICG to Defendants, specifically whether the parties had an expressed and enforceable agreement, and, if not, whether an implied agreement exists, as well as the amount ICG is entitled to recover from one or more of Defendants for the services rendered. Although it is undisputed that an offer was presented by ICG to develop and maintain a website and that Defendants accepted the services rendered by ICG, it is disputed whether an enforceable express agreement exists and whether ICG is entitled to recover its damages for breach of contract or for the value of the services rendered under an implied contract. The relevant facts and procedural history are as follows.

In 2003, Philip Steen formed Nashville Sports Leagues, LLC ("Nashville Sports"), for the purpose of providing a recreational sports league for a growing demographic of active adults in Middle Tennessee. Mr. Steen served as the managing member of Nashville Sports until the LLC was administratively dissolved in 2004. Three years later in January 2007, Mr. Steen registered TN Sports, LLC ("TN Sports") with the Tennessee Secretary of State. TN Sports performed the same functions as Nashville Sports, and Mr. Steen continued to serve as the managing member. Mr. Steen also continued to do business under the name "Nashville Sports Leagues."[1] In correspondence, he identified himself as an executive of Nashville Sports Leagues, and used an "@nashvillesports.com" email address.

By spring 2007, the popularity of TN Sports had grown considerably, with 11,000 members on more than 175 teams. Players had their choice of six different sports, with options year-round. The success of TN Sports was due at least in part to the ease of finding willing players and forming teams on the TN Sports website. In addition to its essential networking function, the website provided users with game schedules and venue information, among other details about leagues and events.

Prior to ICG's involvement, Daniel Eisenhower was the website developer for Mr. Steen's company. In the spring of 2007, Mr. Eisenhower accepted employment with ICG and recommended that Mr. Steen move his account to ICG so that Mr. Eisenhower could continue maintaining the site. Mr. Steen agreed and ICG commenced maintaining and servicing the website needs of TN Sports. In the fall of 2007, Mr. Eisenhower left ICG, and

---

[1]Unless otherwise noted, we will refer to the company formed in 2003 as "Nashville Sports," and to the company formed in 2007 as "TN Sports." Outside of a discussion concerning the issue of Mr. Steen's personal liability, the relevant LLC is TN Sports.

Greg Jones, another developer and programmer[2] at ICG, became responsible for servicing the TN Sports website.

As with Mr. Eisenhower, Mr. Jones's services were billed at $85/hour, the standard rate charged for programming at ICG, and the total hours worked were billed monthly. ICG also provided TN Sports with hosting services[3] for a monthly fee. Initially the fee was $249.95/month, but was reduced to $50/month after approximately one year.[4] Throughout the relationship with ICG, Mr. Steen received two monthly invoices for the website services, one for the site maintenance and management performed by Mr. Jones, and one for site hosting.

TN Sports continued to grow, and the corresponding increase in internet traffic taxed the website, which had originally been built in the early 2000s. By the end of 2008, Mr. Jones had become intimately familiar with the business of TN Sports and the extent of the changes needed to improve the website's functionality and to accommodate growth. He recommended that Mr. Steen abandon the old site and build an entirely new one. Mr. Steen agreed, and in January 2008, Mr. Jones emailed Mr. Steen a price quote for the new site. The subject of the email was "Quote," and a four-page document was attached, listing about thirty different features, referred to as "items," that Mr. Steen and Mr. Jones had discussed including in the site. The Quote provided line items for "Item and Description," as well as "Hours" for each item, broken down to thirty-minute increments. The Quote also listed an $85 hourly rate. The last page, "Totals," lists the total hours as 148.5, for a "Total Cost" of $12,622.50. Neither the body of the email from Mr. Jones nor the Quote document itself contained any other information.

Mr. Steen was pleased with the Quote, and Mr. Jones began working on the new site in February 2008. Although the site was not finished, with Mr. Steen's approval it was launched five months later in July 2008. Mr. Steen immediately began experiencing problems with the new site, on the administrative as well as the user side.[5] On the administrative side,

---

[2]The terms "developer" and "programmer" are used interchangeably by the parties. Broadly speaking, the terms refer to someone who writes code for various types of computer software; in this case, writing markup and code for the purpose of developing a website for the internet.

[3]"Hosting" a website involves providing server space and internet connectivity, so that the site will be accessible to users on the World Wide Web.

[4]The reduction was due to a change in the hosting arrangement.

[5]In most websites, the administrator, or "admin," side of the website is where the owner or the
(continued...)

he was unable to use a web browser to administer the site and was required to access the website's raw database to manipulate or add data. To access the raw data, Mr. Steen was required to go through several different steps and use several different computer programs. On the user side, the biggest problems were that user accounts were duplicated, navigation of the site from page to page was illogical, and it was often difficult to differentiate between teams, sports, or leagues. Additionally, the graphics on the website were not displayed properly, such that users were not sure where to click to navigate from page to page, and did not receive a confirmation when they entered data.

The problems with the Nashville Sports League website persisted, and in September 2008, Mr. Steen hired TN Geeks, Inc., to review the work done by ICG. Mr. Steen also hired Robert Blackford from Design615, a Nashville-based website design and technology consulting business, to look into the problems with his site. Mr. Blackford compiled a full list of problems with the site and analyzed the code as written by ICG programmers. He determined that the cost of repairing the problems outweighed the cost of building a new site, and recommended that Mr. Steen start over with a new site.

ICG was likewise dissatisfied with Mr. Steen. In January 2008, when the old site was abandoned and work on the new site began, Mr. Steen's ICG account had a balance of $4,898.49; by September 2008, the balance was over $30,000.[6] Other than $50/month for the site hosting charges, Mr. Steen did not submit a payment between March and October 2008.

Jack Massari, the president of ICG, contacted Mr. Steen for the first time in October 2008 to address the unpaid invoices, and Mr. Steen promptly submitted a $1,500 payment. However, the problems with the website remained. To make matters worse, due to Mr. Steen's account balance, Mr. Massari instructed ICG employees to "slow walk" the TN Sports website, and Greg Jones, who had since left his employment at ICG, was replaced by another ICG programmer who had not previously worked on the site. Finally, in November

---

[5](...continued)
administrator of the site can input or manipulate data. In this case, the admin side allowed Mr. Steen access to parts of the website not accessible to users, for example to enter scores or tournament schedules, and was password protected. The user side enabled members of teams belonging to a league in TN Sports to log in, form teams, view the schedule, etc.

[6]All payments made by Mr. Steen were applied to same ICG account, whether for hosting or development, old website or new website. Invoices for development of the new website totaled $29,882.62: February-$3,134.11; March-$5,757.48; none for April; May-$7,342.97; June-$5,163.43; July-$2,932.00; August-$4,748.28; September-$804.35. Mr. Steen made payments of $1,500 on February 25, 2008; $2,000 on March 12, 2008; and $1,500 on October 15, 2008.

2008, the situation came to a head. Mr. Steen and Mr. Massari exchanged a series of emails concerning the website and Mr. Steen's account balance. They were unable to reach an agreement, and Mr. Steen informed Mr. Massari that TN Sports would no longer be working with ICG.

ICG Link filed a complaint for the unpaid invoices on April 15, 2009, in the Davidson County Chancery Court. The complaint initially named Philip Steen and Nashville Sports Leagues, LLC[7] as defendants, but was later amended to also include TN Sports, LLC. ICG alleged that Defendants "unreasonably held out final payment for services rendered," creating a breach of contract and entitling ICG to the full balance on Defendants' account, $30,107.06. Alternatively, ICG alleged Defendants had been unjustly enriched by receiving ICG's services without paying, and that ICG was entitled to the fair value of those services. In either case, ICG asserted, Mr. Steen was liable in his individual capacity because he identified himself as an agent of "Nashville Sports Leagues," and had not disclosed the real identify of his principal, TN Sports.

Defendants answered, arguing that ICG "materially breached the contract" by failing to produce "an efficient, effective website." Defendants also asserted a counterclaim for breach of contract based on the Quote, alleging:

> 2. TN Sports, LLC in the latter part of 2007 determined it was in need of a website with new web software. In that regard, it contacted . . . ICG Link, Inc. Greg Jones, an employee of that entity, in January 2008 gave a quote to Philip Steen, which included the creation of a new website for The Nashville Sports Leagues. The parties agreed that this website would be operational no later than March 17, 2008, and that the total cost would be $12,622.50. . . .
>
> 3. [ICG] did not complete the website in the time required in the agreement of the parties, and the website even in a defective condition was not completed until June, 2008.
>
> 4. Because of defects in the website, and after attempts at cure by ICG Link, Inc., Mr. Steen in November 2008 refused to do further business with ICG Link, Inc.

---

[7]This was the predecessor to TN Sports, LLC, which had been administratively dissolved in 2004. However, as stated, Mr. Steen continued to use the name "Nashville Sports Leagues" when conducting business for TN Sports.

Defendants sought $902.50 for the costs of the consultations by TN Geeks and Design615, and $20,400 for the cost of a new website by another website development company, iDesign. In response to the counterclaim, ICG "admit[ted] the existence of a contractual arrangement between the parties, entered into the later part of 2007," but argued the "alleged agreement was only an estimate."

A bench trial was held July 6, 2010. Testifying for ICG was Jack Massari, President of ICG, and Jay Johnston, an employee of ICG who was qualified as an expert in the general field of computer programming, but who had not worked on the TN Sports website. Mr. Steen testified on behalf of Defendants, as did Robert Blackford, the website developer from Design615 who reviewed the website built by ICG. Mr. Blackford was qualified as an expert in the field of website design, specifically the "user" side.

One of the main points of contention in the case was whether the Quote reflected the terms of the agreement between the parties. Greg Jones, the ICG computer programmer who supplied the Quote to Mr. Steen, did not testify; only Mr. Steen testified about the conversations he had with Mr. Jones. The record shows the Quote was attached to an email from Mr. Jones to Mr. Steen, time-stamped January 9, 2008, 9:45:56 a.m. CST. The subject line of the email reads "Quote," and the body of the email was blank, except for Mr. Jones's signature.

The Quote consists of a four-page document. The first three pages list twenty-seven different items which, according to Mr. Steen, were to be included in the website, followed by an exceptionally short "description" of the feature, which provided little more than a subtitle for the feature, for example under "Design," the Quote lists, "Site Design" and "Main Template Layout." The Quote also lists the number of hours needed to write the code necessary to add the features to the website. An excerpt from pages one and two of the Quote reads as follows:

### Quote for Nashville Sports Leagues

| Item and Description | Hours |
| --- | --- |
| **Design** | 40 |
| Site Design | 18 |
| Main Template Layout | |
| | |
| **Database** | 4 |
| Database Layout | |
| . . . | |

**Content Management System**

| | |
|---|---|
| Add/Edit Pages | 3 |
| Delete Pages | 0.5 |

. . .

**Admin Team Manager**

| | |
|---|---|
| Add/Edit Team | 3 |
| Delete Team (Will need to delete corresponding records) | 1 |
| Add/Edit Roster | 3 |
| Delete Roster (Will need to delete corresponding records) | 1 |

The last page of the Quote states:

**Totals**

| | |
|---|---|
| **Total Hours** | **148.5** |
| Hourly Rate | $85.00 |
| Total Cost | **$12,622.50**[8] |

The Quote provides no other description of the scope or nature of the services to be rendered by ICG or the scope or nature of the operation or utilization of the new website.

Mr. Steen and Mr. Massari testified primarily about the business arrangement between TN Sports and ICG. Mr. Massari explained ICG's billing practices: that customers are only billed for work done during the previous month, that they are charged a standard hourly fee for that work, and that ICG reserves the right to increase its hourly rates for all of its customers. When discussing the Quote from Greg Jones, Mr. Massari stated that while it was common for the programmers to make "estimates" for the benefit of the customer, those statements are not meant to be binding on ICG or its clients. He testified that ICG frequently gives estimates, but never "formal quotes," due to the nature of the web design business: "We would absolutely go out of business because you can't ever really tell without a really detailed scope of work, which never exists. There's no way to tell exactly what a client will have." He also gave examples of past clients when the final cost of the Website was significantly higher than the quoted price, as well as examples when the final cost was significantly lower than the quoted price.

---

[8]We have used bold type where it appears on the Quote.

Specifically relating ICG's relationship with Defendants, Mr. Massari testified that he did not review the Quote from Greg Jones before it was sent out, nor was he aware of its contents or that Greg Jones agreed to have the site completed by March 18, 2008. Although he admitted that he had not worked on the site, or used the site himself, Mr. Massari stated that the problems Mr. Steen experienced were largely due to the fact that Mr. Steen requested changes to the Website during development, and the fact that Mr. Massari instructed his employees to "slow walk" the project beginning in July 2008. He acknowledged there were major defects with the TN Sports Website, but attributed the defects to the fact that the site was never finished. He testified that the site was about 90% complete when Mr. Steen chose to part ways with ICG.

Mr. Steen's descriptions of the agreement he made with Mr. Jones, and about the ongoing relationship between TN Sports and ICG differed significantly from Mr. Massari's. Mr. Steen testified that the "Quote" from Mr. Jones was part of an explicit contract between TN Sports and ICG for the construction of a new Website. Regarding the Quote itself, Mr. Steen testified as follows:

> Q. Now, the document, . . . the quotation, this was to produce the new website?
> A. This was a quote to produce the new [website] and what the user can see now, yes.
> Q. And did you agree to that quotation?
> A. Yes. This is what I agreed to, $12,622.50.
> Q. Did you ever agree to any more than that?
> A. No.
> Q. Did Greg Jones ever tell you it was going to cost more than that?
> A. No.

Mr. Steen further stated that he and Mr. Jones agreed the Website would be "up and running" by March 17, 2008, with all the functions, navigation, and design they discussed and listed in the Quote. He also testified that he did not ask for any modifications or additions to the Website prior to executing the agreement with Mr. Jones, only repairs to malfunctioning applications.

Mr. Steen testified at length about the defects with the Website. He first described the "global" problems, or problems with the website that did not fall into any single application but which affected the site as a whole, including duplication of user accounts, which occurred when a user played more than one sport or forgot a password; flaws in the navigation system, so that clicking on a certain button would take the user to the wrong subsequent or preceding page; the fact that the website simply did not work at all on certain

web browsers; and the fact that users did not receive confirmations when they input data, such as selecting a certain game day, league or team. When asked during direct examination if each of these items had been specifically discussed with Mr. Jones prior to commencement of the work on the new site, Mr. Steen stated: "Yes. Before we even received the bid we discussed this stuff, and when he released the site to us and it wasn't the way that we discussed it, so yes."

Next, Mr. Steen went through each item listed on the Quote, explaining the way each application was supposed to perform according to his conversations with Mr. Jones, and how the applications actually did perform after the new website was launched. Out of the 27 major items listed on the Quote, Mr. Steen testified that 17 either have significant functionality problems, or simply were never built into the website. Most of the problems were apparent when the site was first launched in July 2008, but others did not appear until later. Mr. Steen testified that the problems were never fixed by ICG, and from late Summer into Fall 2008, it became increasingly difficult for him to get in touch with the programmers working on his site, until he finally decided to stop working with ICG.

The experts, Jay Johnston and Robert Blackford, both testified about the quality of the programming on the site. They too had very different descriptions of the website. According to Mr. Johnston, the TN Sports website was built in a language known as PHP5, in an object-oriented design pattern, which was the industry standard. By contrast, Mr. Blackford testified the website was written in a shorthand version of PHP known as "Smarty," which was only intended to be used for very small projects, and was "terribly ineffective to run [Mr. Steen's] business," to the point of being "unuseable."

The parties submitted post-trial briefs, and the trial court issued a memorandum opinion and order October 28, 2010. The court found there was no mutual assent to the terms of the agreement and, thus, no express contract or implied-in-fact contract existed.

However, the court found that despite the lack of an express agreement, ICG provided a website and expected to be paid for its services. Most importantly, the court found "it would be unjust for Nashville Sports Leagues to retain [ICG's] services without paying for them," concluding that the imposition of a quasi-contract was appropriate and that ICG was entitled to payment for the actual value of the services received by Defendants. To calculate

this figure, the court began with the total amount owed by TN Sports according the ICG invoices, $30,107.06, and made a few small deductions[9] for a total of $27,806.34 plus post-judgment interest.

The court also held Mr. Steen personally liable as an agent of TN Sports, finding that Mr. Steen failed to identify his principal, TN Sports, LLC, in his interactions with ICG, instead using the name "Nashville Sports Leagues." The court rejected Mr. Steen's argument that "Nashville Sports Leagues" was a marketing moniker of TN Sports, because Mr. Steen failed to list any "assumed" or "d/b/a" names in TN Sports's registration with the Tennessee Secretary of State, as required by Tenn. Code Ann. § 48-14-101(d)(2).

Last, the court awarded Defendants $1,157.50 on their counterclaim for breach of contract, the sum of the invoices from TN Geeks ($902.50) and Mr. Blackford at Design615 ($255.00) for work done identifying and attempting to repair the problems in the website built by ICG. The court held Defendants were not entitled to the cost of a new website ($20,400), or the consulting fees charged by Mr. Blackford relating to the construction of a new website. ($855.00). Defendants, TN Sports and Mr. Steen in his individual capacity, both filed timely appeals.

### ISSUES

Defendants argue the trial court erred in imposing a quasi-contract on the parties and in valuing ICG's work at $27,806.34. They contend the trial court's holding should be reversed for two alternative reasons: 1) The evidence at trial shows there was an express contract in place, which ICG breached first by failing to produce an effective website under the terms agreed upon by Philip Steen and Greg Jones, or 2) Due to the uncured defects, the website ICG produced was of little to no value to Defendants; thus, the finding of a quasi-contract should be reversed or the quantum meruit calculation greatly reduced.

Philip Steen in his individual capacity, but not TN Sports, raises one additional issue. He argues the trial court erred in holding him individually liable for the judgment, because the evidence shows that "Nashville Sports Leagues" was a marketing moniker used by TN Sports, and ICG was aware it was contracting with TN Sports.

---

[9]The court subtracted $2,212.31 to account for 202.5 hours billed at a rate of $95/hour, instead of the amount Mr. Steen originally agreed to, $85/hour, upon a finding that "$85.00 per billable hour represents the agreed-upon value of ICG's development services." The court also subtracted $88.41 for hosting services charged to TN Sports in November and December after Mr. Steen notified Mr. Massari that he no longer wished to work with ICG.

-10-

Questions of contract formation and interpretation are questions of law. *Guiliano v. Cleo, Inc*., 995 S.W.2d 88, 95 (Tenn. 1999); *German v. Ford*, 300 S.W.3d 692, 701 (Tenn. Ct. App. 2009). Therefore, the trial court's conclusions on these issues are not entitled to a presumption of correctness under Tenn. R. App. P. 13(d) on appeal. *Angus v. W. Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). Accordingly, we will review these contractual issues de novo and reach our own independent conclusions regarding their meaning and legal import. *Guiliano*, 995 S.W.2d at 95; *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).

With regard to findings of fact by a trial court, we review the record de novo and presume that the findings of fact are correct unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). However, if the trial judge has not made a specific finding of fact on a particular matter, we will review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997). We give great weight to a trial court's determinations of credibility. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000).

## ANALYSIS

A contract can be express, implied, written or oral, but regardless, "'an enforceable contract must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced.'" *Doe v. HCA Health Servs. of Tennessee, Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001) (quoting *Higgins v. Oil, Chem., and Atomic Workers Int'l Union, Local # 3-677*, 811 S.W.2d 875, 879 (Tenn. 1991)).

Tennessee recognizes "two distinct types of implied contracts; namely, contracts implied in fact and contracts implied in law, commonly referred to as quasi-contracts.'" *Ferguson v. Nationwide Prop. & Cas. Ins. Co.*, 218 S.W.3d 42, 49 (Tenn. Ct. App. 2006). A contract implied in fact is similar to an express contract, in that it "arises under circumstances which show mutual intent or assent to contract," and "it must be supported by . . . consideration and lawful purpose." *Jones v. LeMoyne-Owen College*, 308 S.W.3d 894, 905 (Tenn. Ct. App. 2009); *Ferguson*, 218 S.W.3d at 49. By contrast, a contract implied in law is "created by law without the assent of the party bound, on the basis that [it is] dictated by reason and justice."*Ferguson*, 218 S.W.3d at 50. A contract implied in law is also referred to as a "quasi-contract" or an action for "quantum meruit." *Jones*, 308 S.W.3d at 906 (citing

*Metro. Gov't of Nashville & Davidson County v. Cigna Healthcare of Tenn., Inc.*, 195 S.W.3d 28, 32 (Tenn. Ct. App. 2005)).

In the case at bar, the trial court determined there was not an express contract between the parties. The proof the trial court relied upon consists primarily of the testimony of Jack Massari, President of ICG, and Philip Steen. As the court provides in its final order:

> Thus, it is Mr. Massari's testimony that ICG Link's estimate is not intended to be binding on ICG Link or its customers in terms of the number of hours, cost, or completion of the product. Conversely, Mr. Steen testified that he agreed to ICG Link's quote of $12,622.50 and did not agree to pay more than that. . . . Accordingly, it is clear from the proof that there was no meeting of the minds or mutual assent to the terms of the agreement; thus, there is no express or implied contract in fact.

The trial court went on to find that ICG provided TN Sports with a website, that TN Sports used the website, that ICG expected to be paid for the work, and that it would be unjust for TN Sports to retain the benefits of ICG's work without compensating ICG. Based on those findings, the trial court held there was a quasi-contract between the parties and that TN Sports would be required to pay $27,806.34 to ICG, for "the value of the goods and services received by TN Sports."

We have determined the trial court was correct in holding there was not an enforceable expressed agreement because essential terms concerning the website were not sufficiently definite to be enforced. We also concur with the court's holding that the circumstances justify the imposition of a quasi-contract; however, we have determined that the evidence preponderates against the trial court's finding that the value of ICG's services received by Defendants was $27,806.34. We have determined the value of the benefit received was $15,000 and that, after deductions for other charges and credits, ICG is entitled to a judgment in the amount of $13,952.88. Last, we affirm the trial court's holding that Mr. Steen is liable in his individual capacity.

## I.
### CONTRACTING FOR COMPUTER-RELATED SERVICES

A contract "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced." *HCA Health Servs.*, 46 S.W.3d at 196 (quoting *Higgins*, 811 S.W.2d at 879). Indefiniteness concerning an essential element of a contract "may prevent the creation of an enforceable contract." *Id.* (internal

citations omitted). A contract "must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties." *Id.* Put another way, the terms of a contract are sufficiently definite "if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Id.* (citing Restatement (Second) of Contracts § 33(2) (1981)).

We have reviewed the record thoroughly, and we find as the trial court did, that Mr. Steen and Mr. Massari both testified truthfully. Mr. Steen testified credibly that he entered into an agreement with Greg Jones on behalf of their respective employers, and he testified credibly about the terms of the agreement, notwithstanding Mr. Massari's earnest belief that the agreement was not binding on ICG.[10] *See Bill Walker & Assocs., Inc. v. Parrish*, 770 S.W.2d 764, 770 (Tenn. 1989) ("We are not concerned with the parties' state of mind when they entered into the contract, . . . and, therefore, we do not consider their uncommunicated, subjective intentions."). Nonetheless, we find the agreement is unenforceable due to indefiniteness of essential terms; specifically, the agreement does not provide a standard by which to judge whether a breach has occurred.

The Tennessee Supreme Court has looked to leading treatises concerning the requirement of definite contractual terms, stating, "'[c]ertainty with respect to promises does not have to be apparent from the promise itself, so long as the promise contains a reference to some document, transaction or other extrinsic facts from which its meaning may be made clear,'" *HCA Health Servs.*, 46 S.W.3d at 196 (citing Richard A. Lord, *Williston on Contracts*, § 4:27, at 593 (4th ed. 1990)). The Court has also held, "'[i]f the parties provide a practicable method for determining [the] price or compensation there is no such indefiniteness or uncertainty as will prevent the agreement from being an enforceable contract.'" *Id.* (citing Joseph M. Perillo, *Corbin on Contracts*, § 4.3, at 567-68 (Rev. Ed. 1993)).

---

[10]Mr. Steen's testimony about the conversations between himself and Mr. Jones and about the circumstances surrounding the agreement is largely unrefuted. Other than the Quote itself, which is consistent with Mr. Steen's testimony, the only other proof concerning the agreement was testimony from Mr. Massari, the President of ICG. Greg Jones did not testify. Mr. Massari testified that it was not part of ICG's procedure to use written contracts or written change orders, and that while estimates are sometimes provided, they are not intended to be binding. However, Mr. Massari freely admitted he did not participate in any of the conversations between Mr. Steen and Greg Jones, he did not review the Quote until November 2008, and he was not aware of any agreed upon completion date. Mr. Massari also never disputed the fact that Greg Jones was acting on behalf of ICG, and never testified Jones was prohibited from entering into binding agreements. No documentation was introduced showing that Mr. Steen was notified, or was otherwise aware, that ICG had a strict policy of avoiding binding agreements.

The difficulty in the instant case is that although the "price or compensation" might be clear, that is $12,622.50 as testified to by Mr. Steen and reflected in the Quote, the agreement does not describe in sufficient detail what TN Sports was to receive in exchange for $12,622.50. Further, it also does not provide sufficient standards by which to determine whether TN Sports received a website that meets the agreed upon standard. All we have is a generic list of applications and services to be provided but the descriptions are not sufficiently definite to determine if a breach has occurred or, alternatively, to enforce.

This dispute highlights, as one legal scholar puts it, "the unique characteristics of information technology" and the impact these characteristics can have in an otherwise ordinary dispute over unpaid invoices. Michael D. Scott, *Scott on Information Technology Law* § 1.01 (2010). Scott writes:

> Contracting for computer-related services is theoretically no different from contracting for other types of goods or services. . . . [However,] Computer industry technology can be confusing and often ambiguous. To add to the normal confusion experienced by the neophyte, the computer industry has the . . . habit of using terminology in an ambiguous manner, taking everyday words and giving them entirely new meanings, and inventing words to suit its needs. While this creates problems even for those knowledgeable in the industry, it creates additional problems for inexperienced buyers, their counsel, and the judges who must sort out conflicting claims in any contract litigation.

*Id.* § 7.01.

Problems can be exacerbated by the fact that most businesses heavily rely on information technology to operate, and typically the software developer is the only entity with the knowledge to repair defects, especially in custom-designed software. As Scott observes, "[b]ecause of the potential for confusion, misunderstanding, and dissatisfaction that can result from the development of software that does not meet the expectations of the parties, it is incumbent upon the parties to carefully spell out . . . the procedure by which the final software product will be developed . . . ." *Id.* § 10.04. Scott emphasizes especially the need to express the parties' respective obligations when a change to a program is requested, because "[o]ften what appears to the customer to be a minor change necessitates a major rewrite on the part of the [developer]." *Id.* § 10.05(B). He also suggests a payment schedule based on the completion of defined "modules" of the website. *Id.* § 10.05(C). Ownership of certain "generic modules," or modules that can be reused in other websites, as well as ownership of data and both parties' proprietary information are also likely to be areas of contention if not addressed prior to performance. *Id.* § 10.05(D).

-14-

A website development contract, like other contracts in Tennessee, must be "of sufficient explicitness so that a court can perceive what are the respective obligations of the parties." *HCA Health Servs. of Tennessee, Inc.*, 46 S.W.3d at 196. As for the facts of this case and the generic descriptions in the Quote, one simply cannot determine when and if a breach occurred and/or how to enforce the purported agreement. Therefore, we hold the agreement between the parties does not constitute an express contract.

## II.
## Quasi-Contract

Having determined there are essential terms of the parties' agreement that are too vague to be enforced, we will now consider whether ICG is entitled to payment for services rendered on a quasi-contractual theory.

"Where a contract is invalid or unenforceable, the court may impose a contractual obligation when the defendant will be unjustly enriched absent a quasi-contractual obligation." *HCA Health Servs.*, 46 S.W.3d at 197. This is known as a quantum meruit action, or quasi-contract action, and is an equitable substitute for a contract claim. *See Forrest Constr. Co., LLC v. Laughlin*, 337 S.W.2d 211, 227 (Tenn. Ct. App. 2009). A party who has provided goods and services to another may recover the reasonable value of these goods and services when the following five circumstances exist:

> (1) there must be no existing, enforceable contract between the parties covering the same subject matter,
> (2) the party seeking recovery must prove that it provided valuable goods and services,
> (3) the party to be charged must have received the goods and services,
> (4) the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated, and
> (5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them.

*Forrest Constr. Co.*, 337 S.W.3d at 227 (citing *Castelli v. Lien*, 910 S.W.2d 420, 427 (Tenn. Ct. App. 1995)).

All five circumstances listed in *Forrest Construction* are present in this case. First, for the reasons discussed above, there is no existing, enforceable contract between ICG and TN Sports. Second, ICG proved that it provided valuable goods and services. The proof shows

that although there were defects in the website, it was functional and provided some value to Defendants. It is undisputed that Defendants received the website and that the programming work was done for TN Sports. It is also undisputed that ICG expected payment. Last, the computer programmers did extensive, professional work, in their attempts to provide a website; thus, we find it would be unjust for Defendants to retain the benefits of that work without payment.

For the foregoing reasons, we hold the circumstances in this case justify the imposition of a quasi-contract for the work performed by ICG on the TN Sports website in 2008.

### III.
#### DAMAGES

Because there is a quasi-contract between the parties, ICG may be entitled to damages in equity for the work it performed on the new website in 2008 ("2008 Website"). *See Cigna Healthcare of Tennessee*, 195 S.W.3d at 32 ("A party may recover damages in equity if there exists a contract implied in law.").

Liability on a quasi-contract, or quantum meruit liability, "is based on a legally implied promise to pay a reasonable amount for goods or services received." *Castelli*, 910 S.W.2d at 427 (citing *John J. Heirigs Constr. Co. v. Exide*, 709 S.W.2d 604, 607 (Tenn. Ct. App. 1986)); *see also Cigna Healthcare of Tennessee*, 195 S.W.3d at 32. One's entitlement to a recovery under quantum meruit is thus limited to "the *value* of the goods or services, *and not their contract price*." *Forrest Constr. Co.*, 337 S.W.3d at 227 (Tenn. Ct. App. 2009) (citations omitted). Thus, courts may not make such an award without "some proof of the reasonable value of the goods or services . . . ." *Id.* at 228 (citations omitted). The proof does not have to be exact, "it may be 'an estimation of the value of the goods and services.'" *Id.* (quoting *Castelli*, 910 S.W.2d at 428). The burden of establishing entitlement to a judgment for the value of goods or services rendered lies with the party seeking payment for the goods or services rendered. *See Forrest Constr. Co.*, 337 S.W.3d at 228; *Bokor v. Holder*, 722 S.W.2d 676, 680-81 (Tenn. Ct. App. 1986). Thus, ICG has the burden of establishing the value of the benefit received.

The trial court found that, although there were defects in the website, it was written in a computer language standard in the industry and was useable. The court awarded ICG $27,806.34 as the value of the goods and services delivered. It arrived at this figure by taking TN Sports' outstanding account balance according to the ICG billing statements, $30,107.06 (which included all charges from 2007 and 2008, for hosting as well as development

services). The trial court divided that total into development charges, $29,807.06, and hosting charges, $300. For development charges, the court reasoned:

> Mr. Massari testified that it is ICG's policy to change its current billing rates at the company's discretion. During the court of the relationship between ICG and Mr. Steen, the hourly billing rates changed from $85.00 per hour to $95.00 per hour. Mr. Massari testified that Mr. Steen was notified of the change. Mr. Steen agreed to an hourly rate of $85.00 but testified that he did not agree to a change in the hourly rate. Based upon the circumstances and the parties' conduct as evidenced by [an email exchange between Mr. Steen and Mr. Massari], the Court finds that *$85.00 per billable hour represents the agreed-upon value of ICG's development services*.

(Emphasis added). The trial court then determined that TN Sports had been charged $95/hour for 202.5 hours, requiring a reduction of $2,212,31[11] from the overall total.

As for the $300 in unpaid hosting fees (which had accrued from July through December 2008, at a rate of $50/month), the court determined TN Sports should not be responsible for hosting services charged after November 7, 2008, when Mr. Steen notified Mr. Massari that TN Sports no longer wished to use ICG's hosting services. Thus, the court deducted $88.41, for a final amount of $211.59 owed in hosting services.[12] The court also awarded TN Sports $1,157.50 on its counterclaim for breach of contract, for the costs of outside consultations on the defects with the 2008 website.

We applaud the thoughtful and exacting methods employed by the trial court in calculating this judgment, especially considering the limited amount of competent proof on this issue. To calculate the judgment to ICG, we find it appropriate, as the trial court did, to separately calculate the value of the website hosting services and the value of the website development work. Moreover, because the dispute between the parties arose over the work done on the 2008 Website, we also find it appropriate to separate the work performed on the

---

[11]The trial court's order provides the following calculation: 202.5 hours at $95/hour equals $19,237.50. With sales tax, the total is $21,016.97. And, 202.5 hours at $85/hour equals $17,212.50. With sales tax, the total is $18,804.66. The difference between $21,016.97 and $18,804.66 equals $2,212,31.

[12]The trial court's order provides the following calculation for hosting: TN Sports was charged $50/month for November and December, but notified ICG it was going to host elsewhere November 7, leaving 23 days in November for which TN Sports should not have been charged. Thus, in November, TN Sports was overcharged $38.41 ($50/30 days = $1.67/day. 23 days X $1.67/day = $38.41), plus the full $50 in December, for a total of $88.41 to be subtracted from the total hosting charges owed: $300 - 88.41 = $211.59.

2008 Website from the work performed in 2007 on the previous version of the TN Sports website.

First, we affirm the trial court's holding concerning the unpaid hosting charges from July through November 7, 2008, as the proof shows Defendants moved the 2008 Website to another hosting company at that time. Thus, ICG is entitled to recover $211.59 for the unpaid hosting invoices from 2008.

As for the website development work on the 2008 Website, the trial court found ICG was entitled to the "agreed upon value" for these services as reflected in the Quote, $85/hour. Thus, ICG was awarded the full amount invoiced to TN Sports, minus the difference for 202.5 hours billed at $95/hour. We find the trial court erred in employing this method of calculation. ICG is entitled to an award equal to the value of the benefit actually received by TN Sports from the website development work performed by ICG on the 2008 Website, not the amount TN Sports agreed to pay before the work began. As for calculating the value received, it is undisputed there were significant problems with the website as delivered to TN Sports in July 2008, and that the bulk of those problems were not solved by ICG. On the other hand, it is also undisputed the 2008 Website was functional and, therefore, not without some value to TN Sports.

The testimony of the two expert witnesses primarily concerned whether the appropriate computer programming languages were used in building the 2008 Website. Although both experts were qualified and had impressive experience, we find this testimony of little assistance in determining the value received by TN Sports. The objective of the work done in 2008 was to deliver a new and improved website that satisfied the needs of TN Sports and its users, not simply to have industry-standard programming performed. There is no proof in the record that the programming was directed toward achieving that objective.[13]

Proof concerning the value of the 2008 Website as measured by the cost of completion was conflicting. Mr. Massari claimed the project was within 10%, or $3,000 - $4,000 of completion; however, Defendants' expert, Mr. Blackford, testified that the 2008 Website as developed by ICG "was wholly inadequate in terms of [TN Sports] core business processes"

---

[13]As an example of our reasoning, consider a website message board, the purpose of which is to provide a forum for users to hold conversations with each other en masse. One user posts a question or a statement, which the other users can see and respond to at their leisure, in such a way that it is clear whose question or statement is being responded to, and in what order chronologically. The code written for the message board application could be written in an industry-standard computer programming language, but written in such a way that messages are displayed alphabetical order according to the username of the person posting the message. In that case, the messages would be displayed in a nonsensical order, and the computer programming work performed would be of little value to the owner of the website.

and that repairing the defects would be more expensive than building a new, effective website from scratch. The trial court did not make a factual finding on this issue and we are unable to resolve the great disparities in the proof. Accordingly, we will examine other relevant evidence in the record to ascertain the value of the benefit received by TN Sports.

As for the parties' respective views, the record contains an email exchange from November 2008, in which Mr. Steen and Mr. Massari attempt to resolve the amount owed on the TN Sports account. In the email Mr. Steen states, "I would have to say the fair value of the work complete[d] based on research and conversation is $15,000." In a reply the following day, Mr. Massari states, "$20,000 is more like a correct figure." Admittedly, neither claim is supported by any further proof; nevertheless, it is proof that Mr. Steen reasonably believed the services provided by ICG on the 2008 Website were worth $15,000.

As the claimant, ICG has the burden of proof to establish the value received by TN Sports. *See Forrest Constr. Co.*, 337 S.W.3d at 228. Based on Mr. Steen's admission that the website development services were worth $15,000 and ICG's failure to provide competent proof that the value to TN Sports was greater than $15,000, we find the evidence preponderates in favor of a finding that TN Sports received a $15,000 benefit from the services rendered by ICG to develop its new website.

We also find TN Sports is entitled to several deductions from the $15,000 total value of the 2008 Website. The record reflects that TN Sports paid $1,157.50 to two outside consultants, TN Geeks and Design615, in efforts to remedy deficiencies in the 2008 Website. The trial court awarded Defendants a credit for these payments and we find no error with that decision as they were made to address deficiencies in the services provided by ICG; accordingly, these payments shall be credited against the $15,000 award to ICG.[14] The record also reflects that three payments were remitted to ICG by or on behalf of TN Sports in the amount of $1,500 on February 25, 2008; $2,000 on March 12, 2008; and $1,500 on October 1, 2008, for a total of $5,000. The proof shows these payments were made in response to invoices sent for work done on the 2008 Website. Thus, TN Sports is also entitled to a credit for these payments, for a total of $6,157.50 in deductions. Applying these credits, we find ICG is entitled to $8,842.50 for the website development work performed on the 2008 Website.

Last, as discussed much earlier in this opinion, ICG Link provided routine website maintenance services as well as hosting services on the previous version of the TN Sports

---

[14]The trial court awarded Defendants these amounts for their counterclaim for breach of contract. We determined there was not an express contract in place; however, it is equitable that these amounts be deducted from the quantum meruit calculation of the value Defendants received.

website through the end of 2007. TN Sports was billed monthly on an open account, and the balance owing at the end of 2007 (prior to the commencement of work on the 2008 Website) was $4,898.49, including all unpaid maintenance and hosting charges. TN Sports has alleged no deficiencies in the services provided or disputed this obligation. Thus, we find ICG is entitled to $4,898.49 for the work performed in 2007.

In summation, ICG is entitled to recover $211.59 for hosting services provided in 2008; $8,842.50 for the website development services provided in 2008; and $4,898.49 for all unpaid services in 2007. Accordingly, the net award for which ICG is entitled to a monetary judgment is $13,952.88.

## IV.
### MR. STEEN'S PERSONAL LIABILITY

ICG contends that Mr. Steen should be held personally liable for the obligations of TN Sports; Mr. Steen insists he is not liable. We have determined that Philip Steen is personally liable for the obligations of TN Sports because he failed to disclose the identity of his principal.

It is a well-settled principal of law that, in order for an agent to avoid personal liability on a contract negotiated on behalf of the agent's principal, "the agent must disclose not only the fact of the agency, but also the identity of the principal." *Siler v. Perkins*, 149 S.W. 1060 (1912); *Remote Woodyards, LLC v. Neisler*, 340 S.W.3d 411, 417 (Tenn. Ct. App. Aug. 25, 2009).

Although it is clear from the proof that Mr. Steen intended to bind TN Sports, LLC, when he was doing business with ICG in 2007 and 2008, Mr. Steen conducted business under the name of "Nashville Sports Leagues," not TN Sports. Although Nashville Sports Leagues, LLC, was properly organized, it was administratively dissolved in 2004, long before ICG came into the picture and it was never reinstated. As the trial court found, Mr. Steen identified himself as, "Executive, Nashville Sports Leagues" in his transactions with ICG, his email address was "psteen@nashvillesportsleagues.com," and the web address of the website was "www.nashvillesportsleagues.com." Moreover, all of ICG's invoices identify Nashville Sports Leagues as the business Mr. Steen represented.

The only document showing "TN Sports, LLC" as the relevant entity is a payment "voucher," which Mr. Steen testified was a check payable to ICG on the bank account of "TN Sports, LLC." Mr. Massari, however, testified it is common for ICG to accept payment from entities other than the actual client. Considering the totality of the circumstances, we find the voucher insufficient to constitute "disclosure" of Mr. Steen's principal.

We also find no merit to Mr. Steen's assertion that "Nashville Sports Leagues" was a marketing moniker, or "d/b/a" name for TN Sports, LLC, for the same reasons the trial court held. Tenn. Code Ann. § 48-249-106(d) provides in relevant part:

> (d) ASSUMED NAME: A domestic LLC, . . . may elect to adopt an assumed name . . .
>> (1) As used in this chapter, the "assumed name" of a domestic or foreign LLC means any name used by the LLC, other than the LLC's true name, . . .
>> (2) Before transacting any business in this state under an assumed name or names, the domestic or foreign LLC shall, for each assumed name, execute and file, in accordance with §§ 48-249-1005 and 48-249-1007 an application setting forth:
>>> (A) The true name of the applicant;
>>> (B) The jurisdiction in which the applicant is formed;
>>> (C) The applicant's intention to transact business under an assumed name; and
>>> (D) the assumed name that the applicant proposes to use.

The "Entity Detail" for TN Sports, LLC from the Tennessee Department of State shows that TN Sports has no assumed names. The file on "Nashville Sports Leagues" with the Tennessee Department of State does not reveal TN Sports, LLC in a search result.

We, therefore, affirm the trial court's finding that Mr. Steen failed to disclose the identity of his principal, TN Sports, LLC; thus, he is personally liable on the judgment in this action.

## IN CONCLUSION

The judgment of the trial court is affirmed in part, modified in part, and this matter is remanded for entry of judgment consistent with this opinion. Costs of appeal are assessed against Defendants TN Sports, LLC, and Philip Steen, jointly and severally.

_____
FRANK G. CLEMENT, JR., JUDGE