# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
May 13, 2014 Session

## GEORGE HUTSELL v. JEFF KENLEY D/B/A TRADEMARK INVESTMENTS

**Appeal from the Circuit Court for Hamblen County**
**No. 10CV155      Thomas J. Wright, Judge**

---

**No. E2013-01837-COA-R3-CV-FILED-JUNE 27, 2014**

---

This case presents issues regarding the propriety of the trial court's rulings on evidentiary issues as well as a motion for directed verdict. The plaintiff sustained damages when his personalty, which was stored in a warehouse owned by the defendant, was subjected to water damage after the roof of the warehouse collapsed. The plaintiff filed the instant action seeking compensatory damages for the value of his damaged property. Prior to trial, the trial court ruled that the plaintiff could present evidence that the defendant also filed a claim with respect to his own damaged property stored in the warehouse. The trial court ruled, however, that the defendant would not be allowed to present evidence regarding the profitability of the plaintiff's business. During the three-day trial, the defendant made a motion for directed verdict that was denied by the trial court. Following deliberations, the jury returned a verdict, finding the defendant to be 100% liable for the plaintiff's loss and awarding damages to the plaintiff of $325,000. The defendant filed a renewed motion for directed verdict, a motion for new trial, and a motion for remittitur. All of the post-trial motions were denied by the trial court. The defendant appeals. Having determined that the trial court committed reversible error by allowing the plaintiff to present prejudicial evidence regarding the defendant's own claim for damages, we vacate the jury's award and remand for a new trial.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Vacated in Part; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Joshua M. Ball and Kristi M. Davis, Knoxville, Tennessee, for the appellant, Jeff Kenley d/b/a Trademark Investments.

William M. Leibrock, Newport, Tennessee, for the appellee, George Hutsell.

**OPINION**

I. Factual and Procedural Background

The plaintiff, George Hutsell, operates a building supply business in Morristown called the Top Shop. In 2006, Mr. Hutsell entered into a lease agreement[1] with the defendant, Jeff Kenley, who co-owned a warehouse in Morristown with his wife. Mr. Hutsell leased space in the basement of the Kenleys' warehouse for the purpose of storing building supplies, doors, vinyl fencing, door components, and other items. In 2009, the Kenleys quitclaimed their interest in the warehouse to Trademark Investments, LLC ("Trademark"). The Kenleys are the owners and managing members of Trademark.

The landlord/tenant relationship between the parties was ongoing on January 8, 2010, when the warehouse was struck by a tractor-trailer, which caused significant damage to the building. Various witnesses testified that immediately following the accident, support columns within the building were displaced, causing the roof and the basement ceiling to sag. The wall where the impact occurred was also damaged. The tractor-trailer was owned by Teton Transportation, Inc. ("Teton") and was driven by George Hawkins.

City of Morristown ("the City") officials testified that they were called to the warehouse on January 18, 2010, by Mr. Kenley and Mr. Purkey, Mr. Kenley's agent, to assess whether the building was safe following the accident. Mr. Hutsell, who possessed the only key to the basement door, was asked to bring his key to the warehouse so that the damage could be surveyed. Mr. Hutsell sent an employee to unlock the basement. Ken Thompson, the building inspector for the City, viewed the damage and told Mr. Purkey that the building needed to be condemned. He testified that although he was not an engineer, he did not believe the building could be repaired. Mr. Thompson related that the City could not prevent people from entering the building and that the building was never actually condemned by the City. Mr. Thompson testified that no one would be arrested for entering the building.[2]

_____

[1]Mr. Hutsell testified that he and Mr. Kenley made a "handshake deal" and that the lease was oral. Mr. Kenley testified that there was a written lease between the parties initially, and when the written lease expired, the tenancy became month to month. Mr. Kenley did not produce a written lease agreement during trial.

[2]This testimony was corroborated by Hugh Jay Moore, the chief building official for the City. Mr. Moore testified that Mr. Kenley had complete control of the property and that the City could not prevent anyone from going in the building. Mr. Moore reported that he never told Mr. Kenley that anyone entering the building would be arrested.

City Fire Marshall Eual Noah also viewed the damage to the warehouse on that day. Mr. Noah likewise testified that he believed the building to be unsafe. He accordingly disconnected the power to the building and directed that yellow caution tape be placed around the structure. Mr. Noah stated that he did not think it was safe for anyone to be in the building, but he acknowledged that he was not an engineer. Mr. Noah had no knowledge of the building ever having been condemned and stated that he had no authority to tell persons they could not be in the building.

After meeting with the City officials, Mr. Purkey called Mr. Hutsell later that day and informed him that the building had been condemned by the City of Morristown. Mr. Purkey also stated that the locks had been changed and that no one was allowed to enter the building. When Mr. Hutsell asked Mr. Purkey if he could remove his inventory from the building, Mr. Purkey told Mr. Hutsell that if he entered the building, he would be arrested. Relying upon the warning, Mr. Hutsell did not retrieve his inventory.

Engineers viewed the damage and submitted proposals for "shoring up" the building. Gary Sharp, who worked in the construction industry and was also employed by Teton, met with Teton's engineer and Mr. Purkey at the warehouse on January 21, 2010. Mr. Sharp testified that in his experience, the building damage would have been simple to repair. He also testified that steps were taken to temporarily buttress the building so that Mr. Hutsell could remove his inventory. The Teton engineer drafted a proposal for temporarily shoring and then repairing the building and roof.

Mr. Sharp related that he was scheduled to meet with Mr. Purkey and the contractor at the warehouse on March 2, 2010, but Mr. Purkey cancelled the meeting while they were in route. Mr. Sharp and the contractor observed the building from the outside and also spoke to Mr. Hutsell at his nearby place of business. Mr. Purkey later called Mr. Sharp when he was driving back to Nashville and instructed Mr. Sharp not to speak to Mr. Hutsell again. Under threat of possible arrest, Mr. Sharp was also told that he would not be allowed back in the building. Mr. Sharp testified that he knew the City required stamped engineering drawings before a building permit could be issued. According to Mr. Sharp, the engineer later prepared stamped engineering drawings, and Mr. Kenley and Mr. Purkey were both informed of this fact.

Todd Duncan, another engineer who surveyed the damage to the warehouse on January 25, 2010, testified that he had concerns regarding the sagging roof and floor. Mr. Duncan recommended that screwjacks be used to temporarily shore up the building, which repair was later completed. As Mr. Duncan disagreed with the repairs proposed by the engineer hired by Teton, he opined that the entire roof would have to be replaced. Mr. Duncan agreed, however, that if the building had been temporarily buttressed and the sagging

roof removed, the building would have been safe to enter. Mr. Duncan related that this could have been accomplished fairly easily.

Ultimately, aside from the temporary shoring measures, no repairs were made to the building. A portion of the roof collapsed a few months following the accident. This occurrence allowed water to enter the building, including the basement. Mr. Kenley admitted that he did nothing to prevent the weathering of the building's contents. He also admitted that he never told Mr. Hutsell that the basement ceiling had been shored so that Mr. Hutsell could enter and remove his inventory. Mr. Kenley acknowledged that the state of Mr. Hutsell's inventory deteriorated the longer those conditions persisted. After receiving letters from the City in March 2010 and November 2010 regarding the condition of the building, Mr. Kenley decided in February 2011 to demolish the warehouse. At that point, Mr. Kenley informed Mr. Hutsell that he needed to remove his inventory before the demolition occurred.

Mr. Hutsell testified that this was the first opportunity during which he was allowed to enter the building and retrieve his inventory. Upon entering, he found that the basement was "full of water" with much of the inventory wet and covered in mold. As he explained, many of the doors were unusable in such condition. Mr. Hutsell compiled a list of the inventory that was damaged. He left behind the unusable inventory and moved the usable inventory to another warehouse. Mr. Hutsell filed the instant lawsuit by initiating claims against Mr. Kenley d/b/a Trademark Investments, as well as Mr. Hawkins and Teton,[3] to recover the value of the damaged inventory and loss of income to his business. The loss of income claim was later voluntarily dismissed by Mr. Hutsell.

A trial spanning three days was conducted in April 2013. Mr. Hutsell testified that he owned ten to twelve thousand doors stored in the basement of the warehouse at the time of the accident. He explained that some of the doors were purchased while others were given to him by door manufacturers because they were "seconds." Regarding the damaged inventory that was unusable, Mr. Hutsell opined that it was worth approximately $503,000, which represented the total cost of replacement. Two other individuals who were currently or formerly in the salvage business also testified regarding the value of the damaged inventory. Jeff Smith testified for Mr. Hutsell that the value of the damaged inventory would be $488,250. Mr. Smith explained that he used a 2012 price list to arrive at this amount but then discounted it by the five- to six-percent increase in value from 2011 to 2012, which decreased the total to $458,955. Mr. Smith opined that his valuation was conservative as he

---

[3]As previously noted, Mr. Hawkins was the driver of the tractor-trailer. Mr. Hutsell initially sued "DC Fin Svcs Amer LLC" as the owner of the tractor-trailer, but Teton was later substituted as the proper party. Agreed orders of compromise and dismissal were entered before trial with regard to the claims against Mr. Hawkins and Teton.

found "low to average" prices for all of the items. He also gave fifty-percent credit on items that were "seconds." Although Mr. Smith testified that this would be the cost to replace the lost inventory, he opined that fair market value was the same as replacement cost in this situation. David Hall provided expert testimony for Mr. Kenley regarding the value of the damaged inventory. He opined that the fair market value of the items would be $200,000.

At the close of the proof, Mr. Kenley's attorney moved for directed verdict on two grounds: (1) that Mr. Kenley in his individual capacity should be dismissed because Trademark was the true owner of the warehouse and (2) that Mr. Hutsell's damages were not proven because he and Mr. Smith testified regarding replacement cost rather than fair market value. The court denied the motion as to Mr. Kenley. The court found that Mr. Kenley was both an actor and an owner in this situation, and that he never informed Mr. Hutsell about the change in ownership of the warehouse such that Mr. Kenley held himself out to be acting on his own behalf. The court found that with regard to the testimony concerning damages, all three witnesses were "unsophisticated" and had proven that in this instance, replacement cost and fair market value were the same.

The jury returned with a verdict, finding Mr. Kenley to be 100% at fault for Mr. Hutsell's loss and awarding damages totaling $325,000 in favor of Mr. Hutsell. Mr. Kenley filed a motion for new trial and a renewed motion for directed verdict, which he later amended to add a motion for remittitur. The trial court denied each of Mr. Kenley's post-trial motions, determining the jury's verdict to be proper and approving same. Mr. Kenley timely appealed.

## II. Issues Presented

The parties present the following issues for review, which we have restated slightly:

1.    Whether the trial court erred by allowing evidence that Mr. Kenley filed a "claim" with respect to certain contents of the building.

2.    Whether the trial court erred by excluding evidence that Mr. Hutsell's business was not viable or profitable.

3.    Whether the trial court erred by failing to grant a directed verdict regarding damages when Mr. Hutsell's only proof of damages was of replacement cost rather than fair market value.

4.    Whether the trial court erred by failing to grant a directed verdict because Mr. Hutsell sued Jeff Kenley d/b/a Trademark Investments

when the proper party defendant was Trademark Investments, LLC.

5.     Whether the trial court erred by failing to grant either the motion for new trial or for remittitur.

6.     Whether Mr. Hutsell is entitled to an award of damages based on Mr. Kenley's filing of a frivolous appeal.

## III. Standard of Review

A motion for directed verdict presents a question of law regarding whether the plaintiff has presented sufficient evidence to create an issue of fact for the jury to decide. *See Burton v. Warren Farmers Co-op.*, 129 S.W.3d 513, 520 (Tenn. Ct. App. 2002). As our Supreme Court has elucidated:

> In reviewing the trial court's decision to deny a motion for a directed verdict, an appellate court must take the strongest legitimate view of the evidence in favor of the non-moving party, construing all evidence in that party's favor and disregarding all countervailing evidence. *Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 819 (Tenn. 2003). A motion for a directed verdict should not be granted unless reasonable minds could reach only one conclusion from the evidence. *Id.* The standard of review applicable to a motion for a directed verdict does not permit an appellate court to weigh the evidence. *Cecil v. Hardin*, 575 S.W.2d 268, 270 (Tenn. 1978). Moreover, in reviewing the trial court's denial of a motion for a directed verdict, an appellate court must not evaluate the credibility of witnesses. *Benson v. Tenn. Valley Elec. Coop.*, 868 S.W.2d 630, 638-39 (Tenn. Ct. App. 1993). Accordingly, if material evidence is in dispute or doubt exists as to the conclusions to be drawn from that evidence, the motion must be denied. *Hurley v. Tenn. Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 891 (Tenn. Ct. App. 1995).

*Johnson v. Tennessee Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006).

With regard to the admission of evidence, this Court has previously explained:

> The admission or exclusion of evidence is within the trial court's discretion. The discretionary nature of the decision does not shield it completely from appellate review but does result in subjecting it to less rigorous appellate

scrutiny. Because, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen.

Discretionary decisions require conscientious judgment. They must take the applicable law into account and must also be consistent with the facts before the court. Appellate courts will set aside a discretionary decision only when the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence. Thus, a trial court's discretionary decision should be reviewed to determine: (1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principles, and (3) whether the trial court's decision is within the range of acceptable alternatives. Appellate courts should permit a discretionary decision to stand if reasonable judicial minds can differ concerning its soundness.

*White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999) (internal citations omitted).

A trial court also has discretion regarding whether to grant a motion for new trial, and "a reviewing court will not overturn such a decision unless there has been an abuse of discretion." *Loeffler v. Kjellgren*, 884 S.W.2d 463, 468 (Tenn. Ct. App. 1994). The trial judge is required to approve or disapprove the verdict as the thirteenth juror, to independently weigh the evidence, and to determine whether the evidence preponderates in favor of or against the jury's verdict. *Id*. at 468-469. Finally, where the trial court has denied a defendant's motion seeking remittitur, this Court must review that decision by determining whether there is material evidence to support the amount of this verdict. *Taylor v. Vaughn*, 1988 WL 20521 at *1 (Tenn. Ct. App. Mar. 4, 1988).

IV. Evidence Regarding Mr. Kenley's Claim for Lost Contents

Mr. Kenley asserts that the trial court erred in allowing evidence to be introduced regarding his own claim for the value of his lost or damaged goods stored in the warehouse. Prior to trial, Mr. Kenley filed a motion *in limine* asking the court to exclude evidence of any insurance payments made to him as a result of the accident. The trial court granted this motion in part and denied it in part, ruling that Mr. Hutsell could introduce evidence that Mr. Kenley had filed a "claim" for $350,000 for loss of contents of the warehouse, but directing that no mention could be made during trial regarding insurance or whether payment was received.

Mr. Kenley contends that the jury was improperly influenced by this evidence because Mr. Hutsell's counsel referred to this "$350,000 claim" numerous times while questioning witnesses and in his closing argument. During deliberations, the jury sent the trial court three questions regarding this claim, inquiring as to (1) whether Mr. Kenley had received compensation from Teton, (2) where the $350,000 claim originated, and (3) whether Mr. Kenley received this money from insurance on the property or building. Mr. Kenley argues that the jury was clearly inflamed by the fact that Mr. Kenley received $350,000 but did not compensate Mr. Hutsell. He contends that this evidence was not relevant to the actual issues of whether Mr. Kenley was liable for Mr. Hutsell's losses and if so, in what amount. According to his argument, the evidence was inadmissible pursuant to Tennessee Rule of Evidence 401. Mr. Kenley further contends that the evidence should have been excluded under Tennessee Rule of Evidence 403 as prejudicial and harmful.

Mr. Hutsell asserts that evidence that Mr. Kenley filed a claim for $350,000 for the contents of the building is relevant to show fair market value of the property lost. Although this could[4] be true if the value of Mr. Kenley's lost property were at issue, the $350,000 claim would have no correlation to Mr. Hutsell's claim regarding the value of his own damaged inventory. At trial, Mr. Kenley explained and Mr. Hutsell's counsel recognized that the $350,000 claim was only for personalty belonging to Mr. Kenley. Prior to trial, however, when the motion in limine was argued and decided, Mr. Hutsell's counsel asserted that evidence of this claim was relevant to show that (1) Mr. Kenley could have been including the value of Mr. Hutsell's inventory in this claim as "contents" of the warehouse and (2) Mr. Kenley did not want Mr. Hutsell to remove this inventory until Mr. Kenley received payment for the claim.

Regarding relevance, Tennessee Rule of Evidence 401 provides:

Rule 401. Definition of "relevant evidence."—"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Our Supreme Court has previously explained:

Relevant evidence is admissible, and irrelevant evidence is not, unless excepted by the state and federal constitutions, the Tennessee Rules of Evidence, or other rules or laws generally applicable to the courts. Tenn. R.

---

[4] *But see Harriman & Ne. R.R. Co. v. McCartt*, 15 Tenn. App. 109, 113 (Tenn. Ct. App. 1932) (noting that the amount of insurance on property is not necessarily evidence of its value).

Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. The admission of evidence is left to "the sound discretion of the trial judge," *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992), and "[r]elevancy is always a judicial question to be determined according to the issue which is to be tried." *Randolph v. State*, 570 S.W.2d 869, 872 (Tenn. Crim. App. 1978) (quoting *Ellison v. State*, 549 S.W.2d 691, 696 (Tenn. Crim. App. 1976)). We review a trial court's admission of evidence under an abuse of discretion standard and will reverse the decision to admit evidence only if "the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning" and admission of the evidence "caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)) (internal quotation marks omitted).

*In re Estate of Smallman*, 398 S.W.3d 134, 149 (Tenn. 2013).

In this case, as stated previously, the primary issues to be determined at trial were whether Mr. Kenley was liable for Mr. Hutsell's damaged inventory and if so, the proper amount of damages to be awarded to Mr. Hutsell. There existed no issue regarding whether Mr. Kenley suffered a loss due to the accident or the value of any such loss. Therefore, the fact that Mr. Kenley filed a claim for $350,000 for the loss of his own property does not "hav[e] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* Tenn. R. Evid. 401. The fact that Mr. Kenley might have included the value of Mr. Hutsell's inventory in this claim, however, as "contents" of the warehouse, and did not want Mr. Hutsell to remove this inventory until Mr. Kenley received payment for the claim, might have been somewhat relevant regarding value and damages. Therefore, at the time the trial court ruled on the admissibility of this evidence, we cannot conclude that the trial court abused its discretion in finding this evidence to be relevant pursuant to Tennessee Rule of Evidence 401.

Evidence that is relevant can still be deemed inadmissible, however, if its probative value was substantially outweighed by the danger of unfair prejudice. *See Herbert by Herbert v. Brazeale*, 902 S.W.2d 933, 938 (Tenn. Ct. App. 1995); Tenn. R. Evid. 403. Tennessee Rule of Evidence 403 provides:

Rule 403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.—Although relevant, evidence may be excluded if its

probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Our thorough review of the record reveals that the $350,000 claim filed by Mr. Kenley for his own damaged property was referred to numerous times during the questioning of witnesses and the closing argument of Mr. Hutsell's attorney. After the jury retired to deliberate, they sent to the court three questions involving this $350,000 claim, including whether Mr. Kenley had received compensation from Teton, from where the $350,000 claim originated, and whether Mr. Kenley received this money from insurance on the property or building. The jury was clearly influenced by the evidence regarding the $350,000 claim filed by Mr. Kenley, to the extent that the judgment was likely affected. This is further demonstrated by the amount of the jury's award in this case of $325,000. While the evidence regarding the value of Mr. Hutsell's lost inventory ranged from $200,000 to $500,000, the jury's award of $325,000 more closely comports with the amount of the claim made by Mr. Kenley.

Considering the entire record in this case, we cannot conclude that the admission of the evidence was harmless. We conclude that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. Because this evidence more probably than not affected the judgment, its introduction constitutes reversible error. *See Mayo v. Shine*, 392 S.W.3d 61, 67 (Tenn. Ct. App. 2012); Tenn. R. App. P. 36 ("A final judgment . . . shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment . . . ."). We therefore conclude that the trial court erred in denying Mr. Kenley's motion for new trial, and we vacate the jury's verdict and remand this case for a new trial.[5]

### V. Evidence Regarding the Profitability of Mr. Hutsell's Business

Although Mr. Hutsell initially presented a claim for loss of income to his business in his complaint, he amended the complaint prior to trial and abandoned this claim. Mr. Hutsell also filed a motion *in limine* seeking to exclude evidence regarding the profitability (or lack thereof) of his business. Mr. Kenley sought to present expert proof from an accountant to demonstrate that Mr. Hutsell's salvage door business was not profitable. The trial court granted the motion *in limine* and excluded this evidence. Mr. Kenley asserts that this evidence should have been admitted because it was relevant to the issue of the value of Mr. Hutsell's inventory. In support, Mr. Kenley contends that Mr. Hutsell's claim that this

---

[5]Given this ruling, Mr. Kenley's issue regarding remittitur and Mr. Hutsell's issue regarding the filing of a frivolous appeal are pretermitted as moot.

inventory was worth over $500,000 was not credible because Mr. Hutsell had experienced an absence of business profitability for four out of the last five years.

Mr. Hutsell contends that evidence regarding the profitability of his business is not relevant to the question of the value of his damaged inventory. We agree. Mr. Hutsell abandoned his claim for loss of income to his business prior to trial, such that the only damages that could be awarded would be based on the value of his inventory that was rendered unusable. As this Court has previously elucidated:

> The purpose of compensatory damages is to compensate a party for the loss or injury caused by a wrongdoer's conduct. The goal is to restore the injured party, as nearly as possible, to the position the party would have been in had the wrongful conduct not occurred. The injured party should be fully compensated for all losses caused by the wrongdoer's conduct.

*Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 57 (Tenn. Ct. App. 2004) (internal citations omitted).

Pursuant to this Court's ruling in *Tire Shredders, Inc. v. ERM-N. Cent., Inc.*, 15 S.W.3d 849 (Tenn. Ct. App. 1999):

> The measure of damage to personal property is as follows:
>
> > If the damages have been repaired or the property is capable of repair so that the three factors of function, appearance, and value have been or will be restored to substantially the same value as before the incident, then the measure of damages is the reasonable cost of repairs necessary for the restoration plus any loss of use pending the repairs.
> >
> > If [the damages have not been repaired][the property is not capable of repair] so as to restore function, appearance, and value as they were immediately before the incident, then the measure of damages is the difference in the fair market value of the property immediately before the incident and immediately after the incident.

*Tire Shredders*, 15 S.W.3d at 855 (quoting Tenn. Pattern Instructions 3 - CIVIL 14.40). *See also Bickers v. Chrysler Motor Credit Corp.*, 1991 WL 18681 at *3 (Tenn. Ct. App. Feb. 20, 1991) ("[T]he choice is made on the basis of whether repairs can restore the chattel to its

-11-

prior fair market value–if so, the measure is the cost of repairs plus loss of use; if not, the measure is the difference between the fair market value immediately before the injury and the fair market value immediately after the injury.") (quoting M. COINER, TENNESSEE LAW OF DAMAGES § 6-3, 110 (1988)).

As the evidence intended to demonstrate that Mr. Hutsell's salvage door business was not profitable would have no relevance to the fair market value of the damaged inventory, the trial court properly ruled that this evidence was inadmissible. We affirm the trial court's ruling regarding this evidentiary issue.

## VI. Directed Verdict

Mr. Kenley argues that his motion for directed verdict should have been granted based upon two grounds: (1) Mr. Kenley in his individual capacity should be dismissed because Trademark was the true owner of the warehouse and (2) Mr. Hutsell's damages were not proven because he and Mr. Smith testified regarding replacement cost rather than fair market value. Because this action will be retried, it is unnecessary for this Court to rule upon the proof regarding damages. We do generally note the propriety of the trial court's ruling that, in certain instances, fair market value and replacement cost can be the same. *See, e.g., Vinsant Plumbing and Heating Co., Inc. v. Rudder Const. Co., Inc.*, 486 S.W.2d 540, 543-544 (Tenn. Ct. App. 1971); *Third Nat'l Bank v. American Equitable Ins. Co. of New York*, 178 S.W.2d 915, 924 (Tenn. Ct. App. 1943).

With regard to whether Mr. Kenley should have been dismissed in his individual capacity, the proof demonstrated that Mr. Hutsell dealt solely with Mr. Kenley when he entered into this lease agreement, which was during the time the warehouse was owned by Mr. Kenley and his wife. Three years later, the Kenleys quitclaimed their interest in the warehouse to Trademark Investments, LLC, a company wholly owned by them. Mr. Hutsell testified that he had no knowledge of a change in ownership and simply continued paying his rent to Mr. Kenley. As such, Mr. Hutsell contended that he knew nothing about the existence of Trademark until this litigation began. Mr. Kenley admitted that he could not remember telling Mr. Hutsell anything about the change in ownership of the warehouse. Following the change in ownership, he did begin depositing Mr. Hutsell's checks into Trademark's bank account.

As previously explained, when determining whether the trial court properly denied the motion for directed verdict, we must take the strongest legitimate view of the evidence in Mr. Hutsell's favor and disregard all countervailing evidence. *See Johnson*, 205 S.W.3d at 370 (Tenn. 2006). The motion for directed verdict should not be granted unless reasonable minds could only reach one conclusion from that evidence. *See id.* Such is not the case here. Mr.

Kenley was, as the trial court properly found, an actor in this case as his decisions directly affected the destruction of Mr. Hutsell's inventory. Further, Mr. Hutsell dealt with Mr. Kenley from inception of the landlord/tenant relationship and had no reason to know that ownership of the warehouse had changed. As Mr. Hutsell points out: "[i]It is a well-settled princip[le] of law that, in order for an agent to avoid personal liability on a contract negotiated on behalf of the agent's principal, 'the agent must disclose not only the fact of the agency, but also the identity of the principal.'" *ICG Link, Inc. v. Steen*, 363 S.W.3d 533, 550 (Tenn. Ct. App. 2011) (holding that a managing member of an LLC could be held personally liable for obligations of the LLC because he failed to disclose the identity of the LLC.). We conclude that the trial court did not err in denying Mr. Kenley's motion for directed verdict on the issue of his individual liability in this case.

## VII. Conclusion

We reverse the trial court's ruling admitting evidence regarding the claim made by Mr. Kenley for the loss of his own property. Because this error was prejudicial to Mr. Kenley, we vacate the jury's award and remand for new trial. We affirm the judgment of the trial court denying Mr. Kenley's motion for directed verdict as well as its evidentiary ruling regarding the profitability of Mr. Hutsell's business. Costs on appeal are taxed equally to both parties. This case is remanded to the trial court, pursuant to applicable law, for further proceedings consistent with this opinion.

_____
THOMAS R. FRIERSON, II, JUDGE

-13-