IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 7, 2024 Session

## SH TRELLEBORG CADENCE, LLC v. THOMAS SMYTHE ET AL.

**Appeal from the Circuit Court for Williamson County**
No. 22CV-358     Deana C. Hood, Judge
_____

### No. M2023-00707-COA-R3-CV
_____

Tenant appeals the trial court's determination that (1) he breached his lease by failing to pay water bills for several years and (2) the apartment complex did not breach the lease by bringing the underlying eviction proceedings. The apartment complex also appeals the trial court's grant of only some of its attorney's fees. Because we conclude that there was no meeting of the minds regarding the payment for water services, we reverse the trial court's finding of a breach of contract. We further determine that Cadence is entitled to quantum meruit relief, and we remand for a determination of the reasonable value of the utilities used by the tenant. We also vacate the trial court's award of attorney's fees and remand for the determination and calculation of those fees allowed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part, Vacated in Part, and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which W. NEAL MCBRAYER and JEFFREY USMAN, JJ., joined.

Drew Justice, Murfreesboro, Tennessee, for the appellant, Thomas Smythe.

Jonathan Cole and Nora A. Koffman, Nashville, Tennessee, for the appellee, SH Trelleborg Cadence, LLC.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

This breach of contract action stems from Defendant/Appellant Thomas Smythe's

admitted failure to pay his water bill.[1] Mr. Smythe signed his first one-year "Lease Agreement" with Plaintiff/Appellee SH Trelleborg Cadence, LLC ("Cadence") in April 2015.[2] A new Lease Agreement was signed each year through April 2022.[3] The Lease Agreements each contained an eight-page "Lease Contract," a "Utility Addendum," and five additional addenda, each of which was signed by both Mr. Smythe and a Cadence representative.

Regarding payment of utilities, the Lease Contract contained the following provision:

> 7. UTILITIES. We'll pay for the following items, if checked:

> ☐ water      ☐ gas    ☐ electricity  ☐ master antenna
> ☐ wastewater ☐ trash  ☐ cable TV
> ☐ other _____

> You'll pay for all other utilities or services, related deposits, and any other charges or maintenance fees related to those other utilities or services. You must not allow utilities to be disconnected—including disconnection for not paying your bills—until the lease term or renewal period ends. . . . If any utilities or services are submetered for the dwelling unit, or prorated by an allocation formula, we will attach an addendum to this Lease Contract in compliance with state agency rules or city ordinance.

The attached Utility Addendum provided, in relevant part, as follows:

> 1. Responsibility for payment of utilities, and the method of metering or otherwise measuring the cost of the utility, will be as indicated below.

---

[1] There was no dispute that water and sewer usage were included as separate line items on the same bill each month. We generally refer only to "water usage" or "water bill" throughout this Opinion, unless indication of the specific line item is necessary.

[2] The 2015 Lease Agreement does not appear in the record. There is no dispute that Cadence or a related entity took over the premises in December 2015. The original party involved in this matter was Cadence Cool Springs. Cadence became the named party in September 2022. For simplicity, we refer only to "Cadence" in this Opinion.

[3] Only the 2021 and 2022 Lease Agreements are included in the record, but there was no dispute that the terms of the Lease Agreement remained essentially the same from year to year. Quotations from the Lease Agreement herein come from the April 2022 Lease Agreement specifically.

a) **Water service** to your dwelling will be paid by you either:
- ☐ directly to the utility service provider; or
- ☐ water bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
  - ☐ If flat rate is selected, the current flat rate is $ _____ per month.
  - ☒ 3rd party billing company if applicable _____

b) **Sewer service** to your dwelling will be paid by you either:
- ☐ directly to the utility service provider; or
- ☐ sewer bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
  - ☐ If flat rate is selected, the current flat rate is $ _____ per month.
  - ☒ 3rd party billing company if applicable _____

c) **Gas service** to your dwelling will be paid by you either:
- ☐ directly to the utility service provider; or
- ☐ gas bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
  - ☐ If flat rate is selected, the current flat rate is $ _____ per month.
  - ☐ 3rd party billing company if applicable _____

d) **Trash service** to your dwelling will be paid by you either:
- ☐ directly to the utility service provider; or
- ☒ trash bills will be billed by the service provider to us and then allocated to you based on the following formula: 4 _____
  - ☐ If flat rate is selected, the current flat rate is $ ___**25.00**___ per month.
  - ☐ 3rd party billing company if applicable _____

e) **Electric service** to your dwelling will be paid by you either:
- ☒ directly to the utility service provider; or
- ☐ electric bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
  - ☐ If flat rate is selected, the current flat rate is $ _____ per month.
  - ☐ 3rd party billing company if applicable _____

[additional utilities omitted]

METERING/ALLOCATION METHOD KEY
"1" - Sub-metering of all of your water/gas/electric use
"2" - Calculation of your total water use based on sub-metering of hot water
"3" - Calculation of your total water use based on sub-metering of cold water
"4" - Flat rate per month
"5" - Allocation based on the number of persons residing in your dwelling unit
"6" - Allocation based on the number of persons residing in your dwelling unit using a ratio occupancy formula
"7" Allocation based on square footage of your dwelling unit
"8" - Allocation based on a combination of square footage of your dwelling unit and the number of persons residing in your dwelling unit
"9" - Allocation based on the number of bedrooms in your dwelling unit
"10" - Allocation based on a lawful formula not listed here
(Note: if method "10" is selected, a separate sheet will be attached describing the formula used)

2. If an allocation method is used, we or our billing company will calculate your allocated share of the utilities and services provided and all costs in accordance with state and local statutes. Under any allocation method, Resident may be paying for part of the utility usage in common areas or in other residential units as well as administrative fees. Both Resident and

Owner agree that using a calculation or allocation formula as a basis for estimating total utility consumption is fair and reasonable, while recognizing that the allocation method may or may not accurately reflect actual total utility consumption for Resident. Where lawful, we may change the above methods of determining your allocated share of utilities and services and all other billing methods, in our sole discretion, and after providing written notice to you. More detailed descriptions of billing methods, calculations and allocation formulas will be provided upon request. . . .

The Lease Contract also contained several provisions regarding the rights and responsibilities of the parties. Paragraph (33) defined acts or omissions that would render Mr. Smythe in default, including failure to "pay rent or other amounts" owed when due. The paragraph also included the following, under the subheading "Other Remedies":

Upon your default, we have all other legal remedies, including tenancy termination. In the event we incur attorney's fees in enforcing this Lease Contract against you or any occupants or guests, you must pay our reasonable attorneys' fees and other litigation costs. In the event we incur attorneys' fees in any lawsuits brought by you against us and we prevail, you must pay our reasonable attorneys' fees and litigation costs.

The parties agree that Mr. Smythe stopped paying his water bill in May 2018, and continued to sign one-year Lease Agreements through April 2022. Then, in June 2022, Cadence filed a detainer action in Williamson County General Sessions Court ("the general sessions court") seeking "possession of the property, damages, attorney fees, and all court costs and litigation taxes." Records from the third-party utility management firm ("RealPage"[4]) showed that Mr. Smythe owed $2,049.57 in water bill statement charges and late payment fees as of February 2022. Mr. Smythe filed an affidavit admitting to his failure to pay the water bills based on his belief that the amounts billed were erroneous and he was being overcharged.

After a trial, the general sessions court granted judgment in favor of Cadence in July 2022. Cadence was awarded a total of $7,831.00 in damages, attorney's fees, costs, and taxes; Mr. Smythe was permitted to remain in the property. Mr. Smythe appealed the matter to the Williamson County Circuit Court ("the trial court").

On August 24, 2022, Mr. Smythe filed an answer, countercomplaint, and third-party complaint. In denying Cadence's entitlement to possession of the property, damages, or other costs, Mr. Smythe raised the affirmative defenses of waiver, estoppel, impossibility,

---

[4] It appears that Cadence's previous utility management firm was acquired by or otherwise became RealPage at some point in 2017.

and unconscionability. The countercomplaint and third-party complaint asserted multiple claims against Cadence and RealPage, together and individually.[5]

The trial court entered an order on September 13, 2022, directing Mr. Smythe to make his outstanding rent payments and continue to make timely rent payments, with Cadence's acceptance of these payment not to be considered a waiver or impairment of either party's claims or defenses. Mr. Smythe was also directed to pay $2,106.53 for outstanding water charges and each subsequent monthly water bill into the court clerk.

In due course, Cadence answered Mr. Smythe's countercomplaint, and RealPage answered his third-party complaint; both entities denied that Mr. Smythe was entitled to any relief and raised multiple affirmative defenses. RealPage then moved to dismiss the entire third-party complaint against it. Cadence joined in the motion and further argued that Mr. Smythe's countercomplaint should also be dismissed. Mr. Smythe responded to both motions, moved to continue trial, and moved to amend his answer, countercomplaint, and third-party complaint.

After a hearing on November 28, 2022,[6] the trial court granted RealPage's motion to dismiss and granted Cadence's motion to dismiss in part, such that only Mr. Smythe's counterclaims for intentional misrepresentation and breach of contract against Cadence remained.[7] The trial court also denied Mr. Smythe's motions to continue trial and amend. Mr. Smythe was prohibited from introducing at trial any Lease Agreement other than the April 2022 version attached to his countercomplaint.

Trial was held December 2, 2022. Jason Sargent, manager of the Cadence property, testified first. Mr. Sargent testified that Cadence's use of a third-party billing company was indicated on the Utility Addendum, where the "3rd party billing company if applicable" box was checked. He also testified that it was his understanding that an allocation method would only be indicated when, like with trash services, Cadence calculated the costs directly. Mr. Sargent further explained that paragraph (2) of the Utility Addendum indicated that a tenant would be responsible for the entire amount billed by the third-party billing company, even if the bill included some charge for the community's water usage beyond that of the tenant individually.[8] It was Mr. Sargent's understanding that each apartment had its own water meter, located in the hot water heater closet and accessible to

---

[5] On his own behalf and on behalf of a proposed class of prior Cadence tenants, Mr. Smythe raised: (1) intentional misrepresentation and breach of contract claims against Cadence alone; (2) a tortious interference with a contract claim against RealPage alone; and (3) conversion, Tennessee Consumer Protection Act ("TCPA"), and Racketeer Influence and Corrupt Organizations Act ("RICO") claims against both Cadence and RealPage.

[6] The trial court entered its written ruling on December 16, 2022.

[7] The dismissal of RealPage has not been appealed, and RealPage is not a party to this appeal.

[8] In addition, the statements from RealPage indicated that "[s]ome charges appearing on this statement may be allocated from master property bills from the respective utility provider(s)."

the tenant,[9] and that each building had at least one communal meter.

Mr. Sargent explained that in April 2016, Cadence began working with the third-party billing company that became RealPage and Cadence residents began receiving an individual water bill directly from RealPage. Cadence took over the collection of its tenants' water bills in approximately April 2022. Around this time, Cadence sent emails to all tenants explaining the transition, indicating that RealPage would continue to send the water bill invoices but that payments for rent, valet trash, and water would be paid to Cadence directly. Mr. Sargent explained that more warning was given to those tenants with "higher balances" because the Cadence employees "knew our instructions were going to be that the balance of the [water] bill would need to be paid in full along with the rent. So anything outstanding was going to have to be paid." Multiple emails indicated that Cadence would not accept partial payments.[10] Mr. Sargent testified that he had personally delivered such a notice to Mr. Smythe's apartment door. Mr. Sargent also testified that in April 2022, when he and Mr. Smythe came together to sign a new Lease Agreement for the year, he made clear Cadence's stance that a continued failure to pay the water bill would result in Mr. Smythe's eviction.

When asked why Cadence continued allowing Mr. Smythe to renew his Lease Agreement and continued accepting Mr. Smythe's monthly rent, despite the outstanding water bill, Mr. Sargent explained that he was instructed not to discuss an issue when the tenant threatened legal action. Thus, because Mr. Smythe had mentioned initiating litigation when complaining about the water bill, Mr. Sargent was not allowed to continue the discussion. Mr. Sargent testified that he "didn't want to evict [Mr. Smythe]. He's been a good resident." But overdue water bills "became a more pressing matter" once Cadence took over collection of the bills from RealPage, and Cadence's policy was that no partial payments, i.e., rent but not water, was to be accepted after April 2022. Mr. Sargent was clear that Mr. Smythe was never told that he could continue renting from Cadence without paying for water or sewer, but also that there was no indication that Cadence's prior acceptance of rent was conditioned on payment of the water bill arrearage.

Records kept by Cadence and RealPage indicated that Mr. Smythe's last payment towards his water bill was in May 2018, and that his accrued balance of water bills and late payment fees was $2,049.57 in March 2022, when Cadence assumed collection of the bills. The RealPage statement issued March 18, 2022, contained a "Beginning Unit Account Statement Balance" of $2,025.42; a "Late Payment Charge" of $16.00; and $8.15 in "Billed Charges Due" for February's combined water usage, sewer usage, and $3.63 "Admin Charge"; for a total of $2,049.57. The April 18, 2022 RealPage statement included charges

---

[9] A picture of the hot water heater in Mr. Smythe's apartment was introduced at trial. Mr. Smythe explained that the usage meter was inaccessible because it was covered and located behind various pipes.

[10] Mr. Smythe denied receiving these emails but stated that he received notices on his apartment door to the same effect.

for May rent; May valet trash; and March water usage, sewer usage, and $3.63 "Admin Charge"; the statement included no indication of the water bill arrearage from prior to March 2022.

RealPage's vice president for product and customer success, Amye Baker, also testified. She explained the process by which bills are issued to individual tenants: the utility company provides Cadence with a bill for the property's total water usage and RealPage calculates the portion of that amount to be billed to the individual resident. To do so, RealPage measures each tenant's actual water consumption with a data collection unit that receives a signal from a transmitter attached to the water meter in every unit and then multiplies that usage by a rate consistent across the entire property.

Ms. Baker explained that in the event of an interruption in the transmission of a tenant's actual water usage, such as when the actual reading appeared significantly higher or lower than usual, RealPage would look to the historical consumption of the unit to provide an estimate of that month's consumption. And when unable to validate that the meter reading is accurate, Ms. Baker explained that RealPage "may elect to apply an adjustment or estimate the consumption down to a more reasonable level until it can be verified what's going on in the unit." Ms. Baker testified that this adjustment would occur prior to the bill being issued to the tenant and would only be reflected on the bill as an "estimated" reading, not an adjustment or credit. Ms. Baker stated that Cadence would have to cover the difference for the adjusted amount.

Mr. Smythe explained that he did not use a significant amount of water over the course of a month and his usage had not change meaningfully in the six years he lived in the Cadence apartment, but his water bills increased dramatically once RealPage took over as the third-party billing company.[11] In 2016, Mr. Smythe's average bill—including water usage, sewer usage, and the $3.63 "Admin Charge", but not any late payment charges—was only $10.63, with $24.91 the highest amount billed and the majority of the bills less than fourteen dollars. The average for 2017 was $20.67, with the highest bill being $54.62, and three months admittedly erroneously billed at less than four dollars. In 2018, Mr. Smythe's average bill was $44.26, with multiple bills over seventy dollars, with $83.26 the highest bill. In 2019, the majority of the bills were less than thirty dollars, but the highest bill was $104.43, raising the average to $28.80. There were two bills over a hundred dollars in 2020, for an average of $34.86. The data presented for 2022 spanned only to July, but the average bill was $9.85, with all bills less than twelve dollars.

Mr. Smythe's recorded usage similarly spiked between 2017 and 2020.[12] While Mr.

---

[11] Cadence introduced into evidence the actual bills sent by RealPage, a ledger of Mr. Smythe's recorded water usage, and a chart listing Mr. Smythe's monthly usage-only bill and yearly average payment.

[12] Each bill included the same usage for both water and sewer in five gallon units, but multiplied this usage by different rates for water and sewer. These rates varied slightly from month to month.

Smythe's monthly usage ranged from 335 to 1,870 gallons in 2016, his usage readings hit as high as 4,610 gallons in July 2017, 6,570 gallons in June 2018, 7,730 gallons in December 2019, and 8,790 gallons in June 2020.[13] Mr. Smythe's usage did not rise above 810 gallons per month in 2021, or 585 gallons per month in the first half of 2022. While Ms. Baker had testified that 100 gallons per person per day would be "a fairly conservative estimate[,]" Mr. Smythe relied on his experience as a building developer to explain that he believed between 1,000 and 2,000 gallons per month was a normal usage. Mr. Smythe further denied that the few documented issues with his toilets during his time at Cadence could have caused the spikes in his water usage.

Mr. Smythe testified that he believed that his water usage should not have amounted to more than ten to fifteen dollars per month. Despite this, Mr. Smythe testified that he had offered to pay Cadence $15.00 per month for each outstanding bill, when he renewed the Lease Agreement each year. Mr. Smythe admitted that he was informed in April 2022, that Cadence would stop accepting his rent if he did not bring his water bill current, but that nothing to that effect had been indicated when the previous Lease Agreements were signed.

The trial court entered its final order on January 4, 2023. The trial court found that Mr. Smythe offered no proof to support his counterclaim for intentional misrepresentation and failed to prove his breach of contract counterclaim by a preponderance of the evidence, such that both of his claims failed. The trial court also found that Cadence had proven that Mr. Smythe breached the Lease Agreement by failing to pay the water bills. Cadence was awarded possession of the property and $2,041.42 in damages. Cadence was also awarded "a 25% attorney fee for the amount in controversy which amounts to $510.55." The court clerk was directed to distribute these awards from the escrow fund and return all remaining sums to Mr. Smythe.

Cadence moved to alter or amend the award of attorney's fees and damages on February 3, 2023. Cadence argued that it was entitled to a recalculation of the attorney's fees award as the Lease Contract allowed for payment of its reasonable attorney's fees in successfully defending against an action by Mr. Smythe, but the trial court awarded only a portion of its fees without consideration of the reasonableness of the fees incurred.[14] Cadence also argued that it was statutorily entitled to its attorney's fees in relation to its successful motion to dismiss. Cadence further argued that the trial court's final order should be amended to include an award of $2,159.02 to encompass Mr. Smythe's outstanding balance, as well as an award of all charges that would become due while Mr. Smythe remained on the property. Mr. Smythe generally denied that Cadence was entitled to any additional award, but did not dispute that the court reporter expenses should be

---

[13] Records confirmed that bills for ten months included estimated readings. The highest of these estimated months, July 2020, was for only 2,150 gallons.

[14] Cadence acknowledged that it had not provided the trial court with proof of its attorney's fees prior to trial and included proof of a total of $2,370.00 in fees and costs from the general sessions court matter and $69,082.50 in fees and costs for the trial court litigation, for a total of $71,452.50.

awarded.

The trial court granted Cadence's motion to alter or amend by order of April 11, 2023. Therein, the trial court awarded Cadence (1) $670.14 in court reporter fees; (2) $15,184.00 in attorney's fees related to its motion to dismiss; (3) $10,000.00 in reasonable attorney's fees related to the remainder of its defense of Mr. Smythe's countercomplaint; and (4) $2,136.10 in compensatory damages for Mr. Smythe's water bill arrearage. Thus, the court clerk was directed to distribute a total of $27,990.24 to Cadence from the escrow fund and return any remaining sums to Mr. Smythe.

Mr. Smythe thereafter filed a timely appeal.

## II. ISSUES PRESENTED

Mr. Smythe raises the following issues on appeal, taken directly from his brief:

I. Did the judge err in finding that [Mr.] Smythe breached the lease by not paying his full water and sewer bill, even though (a) the bill was wrong, (b) he had tried to pay the correct lower amount, only to be repeatedly refused, and (c) the lessor had continued accepting his hefty rental payments for years?
II. Did [Cadence] actually breach the contract, by refusing to accept Smythe's rent until he paid a fraudulent water bill, and then by wrongly suing him?

Cadence raises an additional issue on review, also taken directly from its brief:

I. Whether the Trial Court erred in failing to find that [Cadence's] requested attorney's fees (beyond those awarded in full as to the Motion to Dismiss) and costs were reasonable and awarding same to [Cadence], as the prevailing party pursuant to the [] Lease Contract.

## III. STANDARD OF REVIEW

Findings of fact in bench trials are reviewed de novo, with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). *McNaughten v. Lunan*, No. M2008-00806-COA-R3-CV, 2010 WL 1956996, at *4 (Tenn. Ct. App. May 14, 2010) (citations omitted). Questions of law are also reviewed de novo, but with no presumption of correctness. The legal effect of a contract is a question of law. *Id.* (citing *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d at 191, 196 (Tenn. 2001); *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)).

## IV. ANALYSIS

## A.

Mr. Smythe argues that he did not breach the Lease Agreement because the Utility Addendum failed to specify a method of allocating his individual water bill, such that he was only required to pay for his actual water usage. Cadence asserts that the Utility Addendum controls, and Mr. Smythe was required to pay the entire amount billed by RealPage. The first issue before us concerns whether the parties entered into an enforceable contract, such that Mr. Smythe's refusal to pay the water bills tendered by RealPage constituted a breach of the Lease Agreement.

A fundamental requirement for a contract to be enforceable is "mutual assent to the terms of the agreement[,]" or, in other words, "a meeting of the minds of the parties." *McNaughten*, 2010 WL 1956996, at *4 (citations omitted). This "meeting of the minds cannot be accomplished by the unilateral action of one party, nor can it be accomplished by an ambiguous course of dealing between the two parties from which differing inferences regarding continuation or modification of the original contract might reasonably be drawn." *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990). As such, "[i]ndefiniteness regarding an essential element of a contract 'may prevent the creation of an enforceable contract.'" *HCA Health Servs.*, 46 S.W.3d at 196 (quoting *Jamestowne on Signal*, 807 S.W.2d at 565); *see also United Am. Bank of Memphis v. Walker*, No. 3, 1986 WL 11250 (Tenn. Ct. App. 1986) ("In order for a contract to be binding it must spell out the obligation of the parties with sufficient definiteness that it can be performed.").

The Tennessee Supreme Court has recognized, however, that "[c]ertainty with respect to promises does not have to be apparent from the promise itself, so long as the promise contains a reference to some document, transaction or other extrinsic facts from which its meaning may be made clear." *HCA Health Servs.*, 46 S.W.3d at 196 (quoting 1 Richard A. Lord, *Williston on Contracts*, § 4:27, at 593 (4th ed. 1990)). In that case, the contract signed by the plaintiff patient as part of the defendant hospital's pre-admission process included a provision authorizing the hospital to bill the patient's insurance. *Id.* at 194. The contract also read: "I understand I am financially responsible to the hospital for charges not covered by this [insurance] authorization." *Id.* After she received treatment, the patient's insurance company paid eighty percent of the hospital bill, leaving an unpaid balance. *Id.* When the balance was sent to a collection agency, the patient sought "a declaratory judgment that the hospital breached its contract by demanding unreasonable charges for its goods and services." *Id.* at 195. In moving for summary judgment, the hospital argued that the patient's claim was "based upon the premise that the contract contained an 'open price term' rather than a definite price[,]" but that the term "charges" was adequately definite in its reference to the confidential list of fee-for-service charges maintained by the hospital. *Id.*

- 10 -

The trial court found the term "charges" to be sufficiently definite because it could be quantified by reference to this fee list, and thus, the contract was valid and enforceable. *Id.* However, the trial court found material facts remained in dispute as to the reasonableness of those fees and denied summary judgment. *Id.* The appellate court found that the contract was indefinite because the "charges" provision did not actually reference anything by which the amount the patient had agreed to pay could be ascertained. *Id.* Still, the Court of Appeals found the contract to be enforceable despite its indefiniteness and affirmed the denial of summary judgment so that the fair value of the goods and services provided could be established. *Id.*

Our Supreme Court agreed that the "charges" term was too indefinite, because although the fee list maintained by the hospital could have been used as a means by which the patient's charges could be determined, the contract did not actually include any reference to the list. *Id.* at 197 This rendered the provision unenforceable in contract. *Id.* Yet the Court recognized that the patient would be unjustly enriched if she was allowed to retain the goods or services provided by the hospital without payment. *Id.* at 198. Thus, the hospital was awarded the quasi-contractual remedy of quantum meruit, by which it was entitled to receive the reasonable value of the goods and services it provided. *Id.*

While not identical, the circumstances present in ***HCA Health Services*** are sufficiently similar to the situation before us to determine the outcome of this case. Here, the Lease Contract does not specify a price to be paid by Mr. Smythe for his utilities. The Lease Contract instead references the Utility Addendum, which states that the "[r]esponsibility for payment of utilities, and the method of metering or otherwise measuring the cost of the utility, w[ould] be indicated below." Using the reasoning employed in ***HCA Health Services***, the failure to include a sum-certain amount within the Lease Contract is not fatal to Cadence's claim, if the Utility Addendum then included some means by which the calculation of water and sewer charges could be made clear. In that case, the Lease Contract would be considered sufficiently definite despite lacking a price term on its face.

We see this in practice in relation to the payment for trash and electricity services. The Utility Addendum clearly indicates in paragraph (1)(d) that "trash bills will be billed by the service provider to [Cadence] and then allocated to [Mr. Smythe] based on the following formula: 4[.]" The Utility Addendum's metering/allocation key indicates that formula (4) involves a "[f]lat rate per month[,]" and this flat rate is set at $25.00 per month in paragraph (1)(d). By using this key, and including an amount in accordance with the method indicated, the Utility Addendum explains how trash services will be billed. Then, for electricity, paragraph (1)(e) clearly indicates that "[e]lectric service to [Mr. Smythe's] dwelling will be paid . . . directly to the utility service provider[.]" Although the Utility Addendum does not list a specific price for this service, it does explain that the charge will be calculated and billed by the utility service provider directly. Thus, the Utility Addendum provides enough clarity to render the Lease Agreement sufficiently definite relative to these

- 11 -

utilities, and neither party disputes how these utilities were to be billed and paid.

The issue here arises because paragraphs (1)(a) and (1)(b) of the Utility Addendum, dealing with water and sewer billing, respectively, are not fully completed. In each paragraph, the only box checked is for third-party billing, "if applicable[.]" The box for direct billing is not checked, neither is the box that would indicate that Cadence would be billed and then allocate the bills to Mr. Smythe. Unlike with trash services, no method is indicated regarding the allocation of the water and sewer bills. Thus, "[w]hile it is true that the [Utility Addendum's metering/allocation method key] *could* be used as a reference in determining [Mr. Smythe's water bill], the flaw in [Cadence's] argument is that the [Utility Addendum] itself does not contain[ ] a reference to some document, transaction or other extrinsic facts [e.g., the Utility Addendum's metering/allocation method key,] from which its meaning may be made clear." ***HCA Health Servs.***, 46 S.W.3d at 197 (internal quotation marks and citation omitted). The Lease Agreement is correspondingly rendered indefinite by its reference to the deficient Utility Addendum.

Cadence asserts that paragraph (2) of the Utility Addendum supports its position that Mr. Smythe was required to pay the amount billed by RealPage, despite that amount including some charge for water use in communal areas and administrative fees. To be sure, Mr. Smythe does not dispute that this paragraph required payment of these additional costs. However, paragraph (2) contemplates that "[i]f an allocation method is used," the allocation will comply with state and local statutes, and that "[u]nder any allocation method," utility usage in common areas and administrative fees may be included. Thus, the plain language of this paragraph expressly limits the inclusion of communal utility charges and administrative fees to situations where an allocation method is selected. *See* ***Huber v. Calloway***, No. M2005-00897-COA-R3-CV, 2007 WL 2089753, at *4 (Tenn. Ct. App. July 12, 2007) (noting that "the language used in a contract should be given its natural and ordinary meaning"). In other words, the choice of an allocation method was necessary for the additional charges to be applicable. Because none of the listed methods for allocating Mr. Smythe's water and sewer bills are indicated in paragraphs (1)(a) and (1)(b), any agreement regarding the reasonableness of a method that includes charges for communal use and administrative fees is purely theoretical. *See* ***id.*** ("Contract provisions should be considered in the context of the entire contract.").

Moreover, Mr. Sargent explained at trial that Cadence did not know how RealPage calculated the amount to bill its tenants. At oral argument, Cadence admitted that the actual method used by RealPage to allocate Mr. Smythe's utility bills was likely some combination of the listed allocation methods. So even if we read paragraph (2) as an agreement between the parties that Mr. Smythe would be required to pay for more than his individual usage under any of the allocation methods listed regardless of whether the method was specifically indicated, there is no proof that any of these methods were actually used to calculate Mr. Smythe's bills. This further undermines our ability to ascertain any meaning the metering/allocation method key could provide to the Utility Addendum.

Without some actual direction as to how the water and sewer bills would be calculated by the third-party billing company, the Utility Addendum, and in turn, the Lease Agreement, does not create a sufficiently definite agreement as to these utilities. *HCA Health Servs.*, 46 S.W.3d at 196–97 (noting that in cases "in which it is clear that the parties have not expressly or implicitly agreed upon a 'reasonable price,' and also have not prescribed a practicable method of determination . . . the agreement is too indefinite and uncertain for enforcement" (quoting 1 Joseph M. Perillo, *Corbin on Contracts*, § 4.3, at 567–68 (Rev. ed.1993)). Accordingly, we reverse the trial court's determination that Mr. Smythe's failure to pay the third-party water bills was a breach of the Lease Agreement.[15]

Like in **HCA Health Services**, we turn next to consider the effect of this indefiniteness on Cadence's right to be reimbursed for the utilities provided to Mr. Smythe. Tennessee law acknowledges that a contract may be implied despite the parties' failure to establish a valid contract. *See* **Williams v. Coffey**, No. E2007-01476-COA-R3-CV, 2008 WL 1788060, at *3 (Tenn. Ct. App. Apr. 21, 2008). As relevant here, "contracts implied in law are created by law without the assent of the party bound, on the basis that they are dictated by reason and justice." *Id.* (quoting **Ferguson v. Nationwide Prop. & Cas. Ins. Co.**, 218 S.W.3d 42, 50 (Tenn. Ct. App. 2006)). "The theory of unjust enrichment is based on the principle that 'a party who receives a benefit that he or she desires, under circumstances rendering retention of the benefit without providing compensation inequitable, must compensate the provider of the benefit.'" **Cole v. Caruso**, No. W2017-00487-COA-R3-CV, 2018 WL 1391625, at *3 (Tenn. Ct. App. Mar. 20, 2018) (quoting **Freeman Indus., LLC. v. Eastman Chem. Co.**, 172 S.W.3d 512, 525 (Tenn. 2005)). As such, "even where a contract is invalid or unenforceable, the trial court may impose a contractual obligation on a defendant under the doctrine of quantum meruit to prevent unjust enrichment." **McNaughten**, 2010 WL 1956996, at *6 (citing **HCA Health Servs.**, 46 S.W.3d at 197); *see also* **Castelli v. Lien**, 910 S.W.2d 420, 427 (Tenn. Ct. App. 1995) ("Quantum meruit actions are equitable substitutes for contract claims.").

For a party to recover under a contract implied in law or quantum meruit theory, the following circumstances must exist:

> (1) there must be no existing, enforceable contract between the parties covering the same subject matter,
> (2) the party seeking recovery must prove that it provided valuable goods and services,
> (3) the party to be charged must have received the goods and services,
> (4) the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated, and

---

[15] Mr. Smythe's argument regarding the trial court's failure to consider his breach of contract affirmative defenses of impossibility and waiver is thus rendered moot.

(5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them.

***Forrest Const. Co., LLC v. Laughlin***, 337 S.W.3d 211, 227 (Tenn. Ct. App. 2009) (quoting ***Castelli***, 910 S.W.2d at 427). From our review, all five conditions are present in this case.

As discussed above, there is no valid, enforceable contract between Cadence and Mr. Smythe as to water and sewer billing. There is no dispute that Cadence provided water and sewer services, that Mr. Smythe received these services, or that Cadence expected to be compensated for these services. And the circumstances demonstrate that Mr. Smythe would be unjustly enriched if allowed to receive the benefit of years of water and sewer usage without payment. So we conclude that Cadence is entitled to be paid the reasonable value of the utility services provided to Mr. Smythe under a quantum meruit theory. *See* ***id.*** ("One's entitlement to a recovery under quantum meruit is limited to the *value* of the goods or services, and *not their contract price*." (citing ***Castelli***, 910 S.W.2d at 427)).

Generally, the reasonable value of services is determined "based on the customs and practices prevailing in the same sort of business in which the services would normally be provided." ***Williams***, 2008 WL 1788060, at *4 (citation omitted). While the recovery must be based on some proof of the reasonable value of the goods or services, "the required proof may be an estimation of the value of the goods and services." ***HCA Health Servs.***, 46 S.W.3d at 198 (citing ***Castelli***, 910 S.W.2d at 427). The party seeking payment for goods or services rendered bears the burden of establishing the reasonable value received by the other party. ***ICG Link, Inc. v. Steen***, 363 S.W.3d 533, 549 (Tenn. Ct. App. 2011) (citing ***Forrest Const. Co.***, 337 S.W.3d. at 228).

Here, Cadence has presented no proof of the reasonable value of the utility services provided to Mr. Smythe, furnishing only the amounts billed by RealPage, which include some bills based on readings of Mr. Smythe's water meter that were admittedly estimated or likely erroneous. Thus, the only proof in the record regarding the value to Mr. Smythe of the utilities he received is his own testimony that he believed $15.00 per month was an adequate amount to cover his own water usage and the various costs associated with "whatever markups [Cadence] needed to handle," including its administrative expenses. This aligns closely with the evidence in the record indicating that the amount billed to Mr. Smythe increased dramatically around the time RealPage took over as Cadence's third-party billing company. In 2016, Mr. Smythe's bill rose above $14.00 only once, and for six of those months the bill was less than $11.00. In the following forty-eight months, i.e., January 2017 through December 2020, Mr. Smythe's bill was under $14.00 only ten times—and three of those months resulted from admittedly erroneous water meter readings. In 2021, all of the bills were under $15.00, but still above $11.00. Finally, Mr. Smythe's bill returned to pre-RealPage numbers in 2022, with the bill for each of the first seven months being $11.50 or less. As Cadence provided no proof that Mr. Smythe

received a greater value in water and sewer services than his estimate of $15.00 per month, and in fact, its own exhibits correspond with Mr. Smythe's reasoning, we are inclined to rely on this figure.

We used a similar metric in *ICG Link*, where the parties failed to establish a standard by which to judge if a breach occurred, rendering the contract for computer-related services unenforceable. *Id.* at 545. This Court found that the service-recipient was liable for the reasonable value of its services under a quasi-contract obligation. *Id.* at 546–47. Unlike the trial court, we did not calculate the quantum meruit damages by reference to the price agreed upon in the unenforceable contract. *Id.* at 547–48. Instead, we relied on an email communication in which the parties attempted to resolve their disagreement over the amount owed. *Id.* at 549. Therein, the recipient of the service indicated that it found $15,000.00 to be the "fair value of the work complete[d]," and the service provider countered that $20,000.00 was "more like a correct figure." *Id.* Despite neither price being supported by any further proof, this Court determined that the figure proffered by the recipient indicated that it reasonably believed the services provided were worth $15,000.00. *Id.* When the service provider failed to present competent proof that the value of its services was greater than the recipient believed it to be, we concluded that the evidence preponderated in favor of a finding that the recipient received a $15,000.00 benefit from the provider's services.[16] *Id.*

Like in that case, the claimant here, Cadence, has failed to meet its burden to prove the value received by Mr. Smythe. Based on record before us, we conclude that the evidence preponderates in favor of a finding that Mr. Smythe received $15.00 in value for each month he received utility services through Cadence. The record establishes that Mr. Smythe made his final payment toward his water bill in May 2018. It is not clear, however, if Mr. Smythe made any payments toward his water bill after this litigation began. Nor is it clear when Mr. Smythe moved out of the Cadence property or otherwise stopped accruing charges for his water usage. Accordingly, we vacate the trial court's award of $2,136.10 in compensatory damages for Mr. Smythe's water bill arrearage and remand this matter for calculation of the reasonable value of Mr. Smythe's post-May 2018 water usage at $15.00 per month.

**B.**

Mr. Smythe's second issue on appeal is that Cadence breached the April 2022 Lease Agreement by refusing to accept his May 2022 rent payment. Although this section of his appellate brief is somewhat sparse, it appears that Mr. Smythe's argument is that the trial court erred by looking beyond the face of the Lease Agreement to determine its terms. As

---

[16] The Court went on to calculate a series of deductions to which the recipient was entitled, such that the service-provider did not receive this full $15,000.00 figure, *id.*; no such deductions are applicable here.

to what external evidence the trial court relied on, Mr. Smythe refers only to "oral statements by the Cadence apartment manager and any emails or written notices that contradict the [Lease Agreement.]" From our review, it is likely that Mr. Smythe is referring to Mr. Sargent's testimony and the corresponding exhibits explaining that Mr. Smythe was informed prior to signing the April 2022 Lease Agreement that Cadence was conditioning his continued tenancy on his payment of his outstanding water bill.

Generally, when a written contract is meant to embody the entire agreement between parties, the writing "cannot be modified by evidence of earlier or contemporaneous agreements that might add to, vary, or contradict the writing." *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 695 (Tenn. 2019) (quoting Black's Law Dictionary 1292 (10th ed. 2014)). This rule becomes "most restrictive when the contract at issue is fully or completely integrated—that is, when it is intended to be the complete and exclusive statement of the parties' agreement." *Id.* at 696 (citing *Schaeffer v. Am. Honda Motor Co.*, 976 F. Supp. 736, 741 (W.D. Tenn. 1997) ("An integrated agreement is a writing constituting a final expression of one or more terms of an agreement; a completely integrated agreement has been 'adopted by the parties as a complete and exclusive statement of the terms of the agreement.'" (quoting Restatement (Second) of Contracts §§ 209-210 (1981)))). A contract being fully integrated not only "prohibit[s] the use of pre-contract negotiations to contradict the contract's terms; it also prohibits the use of pre-contract negotiations within *the scope of* the agreement in a way that would *supplement* or *limit* its terms, even if that evidence is consistent with the written terms of the contract." *Id.*

Here, the Lease Contract written by Cadence provides: "Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease Contract is the entire agreement between you and us." Thus, the Lease Contract is fully integrated, and Mr. Sargent's testimony regarding Cadence's condition for renewing Mr. Smythe's Lease Agreement would not be included in the parties' agreement. *See id.* at 967 (noting that "the parol evidence rule prohibits the use of evidence of pre-contract negotiations in order to vary, contradict, or supplement the contractual terms of a fully integrated agreement").

We note, however, that Mr. Smythe's own testimony indicated that he was aware of the additional term included in the April 2022 Lease Agreement, namely the requirement that he pay his outstanding RealPage water bill. No objection was raised by either party as to this testimony, and a "[f]ailure to object [to] evidence in a timely and specific fashion precludes taking issue on appeal with the admission of the evidence." *Com. Union Bank, Brentwood, Tenn. v. Bush*, 512 S.W.3d 217, 229 n.4 (Tenn. Ct. App. 2016) (quoting *Ottinger v. Stooksbury*, 206 S.W.3d 73, 78 (Tenn. Ct. App. 2006)) (not addressing any challenge to the admission of extrinsic evidence where no objection was raised at trial, and further noting that the appellant "offered his own parol evidence [], and he does not argue that the court erred in admitting his parol evidence"). Mr. Smythe, therefore, has waived

any argument that the trial court could not consider this testimony. *See* ***Grandstaff v. Hawks***, 36 S.W.3d 482, 488 (Tenn. Ct. App. 2000) ("A party who invites or waives error, or who fails to take reasonable steps to cure an error, is not entitled to relief on appeal." (citing Tenn. R. App. P. 36(a), cmt. a.)).

Yet, even if this extrinsic evidence was considered by the trial court, it is clear that the parties contemplated the condition based on the faulty assumption that the parties had a contract requiring Mr. Smythe's payment for water as billed by RealPage. Indeed, the trial court's own decision was based, at least in part, on its finding that the Utility Addendum was enforceable. In its order, the trial court explains only that there was "no dispute as to the validity and enforceability of the Lease Agreement entered into in April of 2022[,]" and that Mr. Smythe "failed to submit proof by a preponderance of the evidence that Cadence breached the Lease Agreement or the Utility Addendum." Its judgment, therefore, was founded on the premise that the Utility Addendum was an enforceable agreement between the parties regarding Mr. Smythe's obligation to pay for water and sewer services as billed by RealPage. The effect of any external negotiations or additional agreements on the question of whether Cadence breached the Lease Agreement becomes less obvious in light of our determination that the Utility Addendum was too indefinite to establish an enforceable contract as to water and sewer billing. And neither party's appellate brief discusses the impact of a finding that there was no valid agreement regarding the payment for water services.

While appellate courts are afforded some "discretion to consider unpresented or unpreserved issues in certain exceptional circumstances[,]" this discretion "is not without limits." ***State v. Bristol***, 654 S.W.3d 917, 926–27 (Tenn. 2022) (citing Tenn. R. App. P. 13(b) (granting such discretion "(1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process")). We do not believe remanding this question to the trial court will injure the interests of the public or prejudice the judicial process. Nor will such a remand create needless litigation, as this matter is already being returned to the trial court for further proceedings related to the calculation of Cadence's quantum meruit recovery. Accordingly, we vacate the trial court's judgment regarding Mr. Smythe's breach of contract countercomplaint and remand the matter for consideration with our determination that the Utility Addendum was unenforceable in mind.

## C.

In its "Cross Appeal" Cadence contests the trial court's award of attorney's fees. Cadence does not dispute the award of $15,184.00 for its successful motion to dismiss. Instead, Cadence questions the $10,000.00 in fees awarded for the remainder of the litigation. Cadence points to the Lease Contract, which includes a provision that Mr. Smythe is responsible for its reasonable attorney's fees incurred both in enforcing the Lease

Agreement against him and in successfully defending against an action brought by Mr. Smythe. Thus, Cadence requests that it be awarded $56,268.50 in non-motion to dismiss attorney's fees, for a total of $71,452.50 in attorney's fees for the litigation in both the general sessions court and the trial court.

Generally, in Tennessee, litigants are responsible for paying their own attorney's fees. ***Eberbach v. Eberbach***, 535 S.W.3d 467, 474 (Tenn. 2017) (citing ***Cracker Barrel Old Country Store, Inc. v. Epperson***, 284 S.W.3d 303, 309 (Tenn. 2009)). This "aligns with the 'American rule', under which 'a party in a civil action may recover attorney's fees only if: (1) a contractual or statutory provision creates a right to recover attorney's fees; or (2) some other recognized exception to the American Rule applies, allowing for recovery of such fees in a particular case.'" ***Donovan v. Hastings***, 652 S.W.3d 1, 6 (Tenn. 2022) (quoting ***Cracker Barrel Old Country Store, Inc. v. Epperson***, 284 S.W.3d 303, 308 (Tenn. 2009)). Both a contractual provision and a statutory provision are relevant to the award of attorney's fees in this case.

First, we look to the language related to attorney's fees contained in paragraph (33) of the Lease Contract. In relevant part, the provision allows Cadence to recover its "reasonable attorneys' fees and other litigation costs" in the event that Cadence either "incur[s] attorney's fees in enforcing this Lease Contract against [Mr. Smythe]" or "incur[s] attorneys' fees in any lawsuits brought by [Mr. Smythe] against [it] and [Cadence] prevail[s.]" As we have determined that there was no enforceable contract between the parties as to payment of utilities, Cadence did not "incur attorney's fees in enforcing this Lease Contract" against Mr. Smythe. Indeed, Cadence's recovery has been reduced to the amount initially offered by Mr. Smythe to avoid litigation altogether. Therefore, the first prong of the attorney's fee provision is not applicable, and no contractual basis exists for an award of attorney's fees in relation to Cadence's claim against Mr. Smythe. *See* ***Segneri v. Miller***, No. M2003-01014-COA-R3-CV, 2004 WL 2357996, at *6 (Tenn. Ct. App. Oct. 19, 2004) ("The language of the fee provision determines whether fees can be awarded under the facts present."); ***Boiler Supply Co. v. Lunn Real Est. Invs., Inc.***, No. 01A01-9605-CH-00246, 1998 WL 684599, at *3 (Tenn. Ct. App. July 1, 1998) ("Where a contract contains a provision allocating the responsibility for paying legal expenses, the obligation to pay legal expenses is limited to only those instances provided for in the contract.").

Under the second clause in the attorney's fee provision, Cadence is entitled to the attorney's fees it incurred in successfully defending against claims brought by Mr. Smythe. Following the trial court's partial grant of Cadence's motion to dismiss, discussed below, only Mr. Smythe's counterclaims for intentional misrepresentation and breach of contract were at issue at trial. Mr. Smythe's intentional misrepresentation claim was dismissed for failure to present any proof, and this ruling has not been disturbed on appeal. Therefore, Cadence prevailed in an action brought against it by Mr. Smythe, and is entitled to its reasonable attorney's fees in relation to the intentional misrepresentation claim. *See*

- 18 -

***Segneri***, 2004 WL 2357996, at \*7 (finding the defendants were entitled to their attorney's fees related to defending against plaintiff's action under lease containing provision allowing for recovery of such fees "[i]f it becomes necessary . . . [to] defend any rights or remedies hereunder"). However, we have vacated the trial court's ruling against Mr. Smythe in relation to his breach of contract counterclaim. Thus, so too must the award of its related attorney's fees be vacated, as whether Cadence prevails in its defense against that claim remains undecided.

Accordingly, we vacate the trial court's entire award of contractually-permitted attorney's fees. At present, Cadence is only entitled to its reasonable attorney's fees related to its defense against Mr. Smythe's intentional misrepresentation claim. However, the trial court's order does not differentiate the fees awarded for that claim from those fees awarded for the breach of contract claim. The $10,000.00 award for these claims may need to be adjusted, as Cadence's entitlement to its reasonable attorney's fees related to Mr. Smythe's breach of contract counterclaim cannot be determined until that claim is resolved on remand.

Second, we look to the attorney's fees awarded under Tennessee Code Annotated section 20-12-119(c). This statute provides that a party is entitled to its "reasonable and necessary attorney's fees" incurred as a result of claims dismissed pursuant to a successful motion to dismiss for failure to state a claim. Subsection (c) "was intended as a limited fee-shifting provision enacted to discourage 'truly frivolous lawsuits.'" ***Donovan***, 652 S.W.3d at 8 (citations omitted). Here, the trial court dismissed Mr. Smythe's TCPA and RICO claims for failure to state a claim upon which relief could be granted pursuant to Cadence's motion to dismiss. Cadence's motion to dismiss was successful in part, and it is thus entitled to the reasonable costs and fees incurred in relation to those claims.[17] *See **id.*** (noting that the language in subsection (c) "relates causally to the *claim* that was dismissed").

However, under section 20-12-119(c)(3), an award of attorney's fees "shall be made only after all appeals of the issue of the granting of the motion to dismiss have been exhausted and if the final outcome is the granting of the motion to dismiss." Thus, "[t]he award of costs and attorneys' fees pursuant to this section shall be stayed until a final decision which is not subject to appeal is rendered." Tenn. Code Ann. § 20-12-119(c)(3). We have previously acknowledged that subsection (c) "clearly and unambiguously requires that there be an unappealable final decision before a trial court can award attorney fees pursuant to the statute." ***Irvin v. Green Wise Homes, LLC***, No. M2019-02232-COA-R3-CV, 2021 WL 709782, at \*6 (Tenn. Ct. App. Feb. 24, 2021) (citation omitted). Obviously, Mr. Smythe had not yet exhausted his appeals at the time that the trial court awarded Cadence its fees under section 20-12-119. So the award of fees under that statute was

---

[17] Because Mr. Smythe's conversion counterclaim was not dismissed for a failure to state a claim, Cadence is not entitled to its attorney's fees in relation to that claim.

- 19 -

premature.

We also note that the trial court determined that Cadence incurred $15,184.00 in reasonable attorney's fees related to its motion to dismiss. However, section 20-12-119(c)(4) expressly provides that in awarding attorney's fees in relation to a successful motion to dismiss for failure to state a claim, "the court *shall not* require a party to pay costs under this section in excess of a combined total of ten thousand dollars ($10,000) in any single lawsuit." Tenn. Code Ann. § 20-12-119(c)(4) (emphasis added). Thus, even if the trial court deemed the amount of attorney's fees requested by Cadence in relation to its motion to dismiss to be reasonable, the statute itself limits the available award. The award must therefore be vacated and determined in light of this cap following the exhaustion of any future appeals.

Finally, Cadence requests an award of its "attorney's fees and costs arising from all proceedings post judgment." Although this issue was not specifically listed in the statement of issues in Cadence's appellate brief,[18] this is not fatal to Cadence's claim so long as it was otherwise adequately preserved. *See Charles v. McQueen*, No. M2021-00878-SC-R11-CV, -- S.W.3d --, 2024 WL 3286527, at *15 (Tenn. July 3, 2024) ("When a request for appellate attorney's fees does not seek relief from the judgment below, an appellee is not required to include the request in the statement of issues. But an appellee is required to present the request to the appellate court by raising it in the body of the brief, adequately developing the argument, and specifying that relief in the brief's conclusion." (citation omitted)).

In this case, however, we cannot say that Cadence's argument regarding its post-judgment attorney's fees and costs was adequately preserved. The entirety of Cadence's discussion of this issue is contained within the request itself. After discussing only the unreasonableness of the trial court's decision to reduce its non-motion to dismiss attorney's fees in this section of its brief, Cadence requests a partial reversal of the trial court's order resolving its motion to alter or amend and an award of the full $56,268.50 it sought in attorney's fees. The next sentence reads, in its entirety, "Further, Plaintiff/Appellee/Cross-Appellant requests remand for the award of attorney's fees and costs arising from all proceedings post judgment." No further discussion follows, and Cadence provides no citation to any legal support for its request. *Id.* (noting that the appellee's request for attorney's fees was supported by "reasoning and citations to legal authority"). Thus, even if we were to look past its failure to include this issue in its statement of the issues, there is no substantive argument that is more than skeletal for us to review. *See Sneed v. Bd. of Prof'l Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts,

---

[18] Again, "[a]s Cross-Appellant," Cadence's statement of the issues included only the following: "Whether the Trial Court erred in failing to find that [Cadence's] requested attorney's fees (beyond those awarded in full as to the Motion to Dismiss) and costs were reasonable and awarding same to [Cadence], as the prevailing party pursuant to the [] Lease Contract."

- 20 -

trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."); *Bean v. Bean*, 40 S.W.3d 52, 55–56 (Tenn. Ct. App. 2000) ("Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue. Moreover, an issue is waived where it is simply raised without any argument regarding its merits." (internal citations omitted)).

Finally, we note that Cadence has not prevailed in any of its arguments in this appeal. As previously discussed, it has failed to establish that Mr. Smythe breached the Lease Agreement. And the question of whether Cadence is liable for breach of contract remains an open question. Although additional claims were raised by Mr. Smythe at the trial court level, these were the only two claims that Mr. Smythe raised in this appeal. As such, Cadence has not shown its entitlement to attorney's fees incurred at the appellate level.

## V. CONCLUSION

The judgment of the Williamson County Circuit Court is reversed in part and vacated in part, and this matter is remanded to the trial court for proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellee SH Trelleborg Cadence, LLC, for which execution may issue if necessary.

S/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE